### In re FORD MOTOR CO. BRONCO II PRODUCT LIABILITY LITIGATION.

**Civil Action No. MDL 991.**

United States District Court,
E.D. Louisiana.

March 7, 1997.

Stephen B. Murray, Murray Law Firm, New Orleans, LA, Michael H. Ellis, Chehardy, Sherman, Ellis, Breslin & Murray, Metairie, LA, T. Roe Frazer, II, Richard A. Freeze, Langston, Frazer, Sweet & Freese P.A., Jackson, MS, Daniel E. Becnel, Jr., Becnel, Landry & Becnel, Reserve, LA, Patrick W. Pendley, Plaquemines, LA, Irwin B. Levin, Cohen & Malad, Indianapolis, IN, for Plaintiffs.

Colvin Gamble Norwood, Jr., McGlinchey, Stafford & Lang, New Orleans, LA, John Beisner, Brian D. Boyle, O'Melveny & Myers, Washington, DC, for Defendants.

*MEMORANDUM AND ORDER*

SEAR, Chief Judge.

*Background*

The captioned litigation has been pending before me since February 9, 1994, when five actions were transferred to this district by the Judicial Panel for Multidistrict Litigation ("JPML") for consolidated pretrial proceedings.[1] The litigation involves consumer actions asserting claims under the federal Magnuson–Moss Warranty Act and state law. Damages and equitable relief are sought for owners of Ford Bronco II vehicles marketed between 1983 and 1990, based on an alleged design defect that renders the vehicle unduly prone to roll over in normal driving conditions. Recovery is not sought for personal injury or death. The background of the cases has been set forth in detail in numerous prior orders and will be repeated here only as relevant.

---

1. *Bates, et al. v. Ford Motor Co.,* 94–0537 (M.D.La.); *Lewis, et al. v. Ford Motor Co.,* 94–0538 (S.D.Miss); *Armistead, et al. v. Ford Motor* Co., 94–0539 (W.D.N.C.); *Luis, et al. v. Ford Motor Co.,* 94–0540 (S.D.Fla.); *Vitrano, et al. v. Ford Motor Co.,* 94–2537 (E.D.La.).

Following approximately four months of settlement negotiations, on or about January 28, 1997 two copies of a proposed settlement were delivered to my chambers. The proposed settlement was not filed in the record by counsel that day and, to date, still has not been filed in the record. At the time the documents were submitted, I assumed the motivation for this was to avoid publicity until the matter had been resolved. However, I soon learned that even before the proposed settlement was submitted to me, Alabama plaintiff counsel and representatives of Ford Motor Company had been interviewed and made statements to the press. Indeed, on January 30, news of the "new settlement" appeared in a number of newspapers across the country, including the Wall Street Journal.

I carefully reviewed the terms of the proposed settlement as well as the related orders and documents, including the proposed notice to be disseminated to putative class members. I also reviewed the various public statements made by the parties' counsel and representatives to the press. On January 30, 1997 I conducted a telephone conference with attorneys for plaintiffs and Ford Motor Company, at which time I verbally expressed my dissatisfaction with the proposed settlement. By minute entry dated January 31, 1997, I found that the proposed settlement was not sufficiently fair, reasonable and adequate to grant preliminary approval and allow dissemination of the proposed settlement to the class. I did not assign detailed written reasons for my ruling at that time. On February 14, 1997, I conducted another conference in chambers with local plaintiff counsel concerning problems with the settlement, but the problems were not resolved to my satisfaction at the conference.[2]

By correspondence dated March 3, 1997, Daniel Becnel, Jr., counsel for plaintiffs in the consolidated matter entitled *Washington*

*v. Ford Motor Company,* who did not take part in the January 30, 1997 telephone conference or the February 14, 1997 conference, but with whom I have met in chambers and discussed the matter subsequently,[3] asks for written reasons why I found the proposed class action settlement not sufficiently fair, reasonable and adequate to allow dissemination of notice to the putative class members. I now respond to that request.

*Discussion*

Of utmost importance to my January 31, 1997 ruling is my previous rejection, on March 20, 1995, of a similar proposed settlement.[4] The March 20, 1995 ruling issued after I had entertained voluminous filings, accepted written objections from putative class members and held a fairness hearing. Some additional background is necessary. At the time the five core actions were transferred in 1994, the JPML advised that the parties were in a settlement posture and a proposed settlement would be forthcoming.[5] For this reason, I did not assume an immediate case management role, but rather waited for advices from counsel concerning the settlement. In July 1994, counsel notified me that a tentative settlement had been reached. Although I questioned the value of the settlement package—a video, sun visor warning sticker, supplemental owner's guide, opportunity for a free safety inspection, and various inspection incentives—nevertheless, on August 3, 1994, I preliminarily approved the proposed settlement solely for purposes of disseminating notice to the putative class members.

Notice was mailed to approximately 690,000 putative class members and published in USA Today. Approximately 109 class members filed written objections and 1,650 requested exclusion from the settlement. On November 8, 1994 I held a hearing concerning the fairness of the proposed settlement, at which I heard argument from counsel for both sides and at least one objecting plaintiff,

---

2. Ford waived appearance at this conference, as the purpose was to address concerns directed exclusively to the attorney fee sought by plaintiff counsel.

3. Specifically, I met with Mr. Becnel and counsel for Ford Motor Company in chambers on February 25, 1997.

4. A copy of the March 20, 1995 Memorandum and order is annexed hereto as Exhibit A. [Not included for publication, See 1995 WL 373061.]

5. Only six months had elapsed between the filing of the various actions and the beginning of settlement negotiations. The settlement negotiations lasted for approximately seven months.

as well as expert testimony. I spent the next few months reviewing the voluminous submissions. On March 20, 1995, in a 23–page memorandum and order I rejected the proposed settlement because I considered the amount of attorney fees sought by two plaintiff attorneys[6]—$4 million—so excessive in relation to the scant discovery conducted by the attorneys and in relation to the benefit offered to class members that it suggested collusion between plaintiff and defense counsel.

After rejecting the settlement, I ruled on various follow-up matters and met with counsel over the next few months to coordinate pretrial deadlines. Several local attorneys became involved in the litigation and the Alabama plaintiffs chose to pursue their claims in state court[7] instead of in these consolidated proceedings. Between approximately September 1995 and September 1996, counsel's efforts were directed toward discovery and motion practice. However, at counsel's request, in October 1996 I stayed discovery and agreed to postpone ruling on a motion for class certification filed by plaintiffs until the parties had sufficient opportunity to amicably resolve the cases.

Counsel kept me advised of the progress of their negotiations, and I assisted in discussions as much as possible without commenting on the merits of the case.[8] Out of concern that I might be faced with the same issues that doomed the previous settlement, I required plaintiff counsel to submit estimates of the fees and expenses they would seek to recoup. Plaintiff counsel responded with *in camera* submissions, and from my calculation the total estimated lodestar for attorney fees and expenses was approximately $1.6 million. I advised plaintiff counsel that I considered this extremely high and they responded that, assuming a settlement was reached, they would accept any amount I found appropriate to award in attorney fees and expenses. The settlement papers submitted in late January

1997, shockingly, included a provision that plaintiff counsel would apply for an award of approximately $6 million in attorney fees and expenses, while noting that, assuming the Court approved the settlement, the Court would determine the actual amount awarded.

I have carefully reviewed all of the settlement documents delivered to my chambers. Unlike the posture of the case when the first settlement was before me, now at least one year has been devoted to discovery, which has been conducted by local plaintiff counsel and by defense counsel in these proceedings.[9] In spite of such effort, however, I find that the content of and circumstances surrounding the second settlement agreement suggest the presence of the same problems that plagued the previous settlement.

The content of the second settlement package differs in few respects from the previously offered package. The recently proposed settlement "utility vehicle package" includes (1) a safe driving and handling video concerning utility vehicles; (2) a supplemental owner's guide; (3) an on-product safety-related sticker; a limited complimentary vehicle inspection; and (4) an offer of cost-sharing by Ford for certain parts and repairs with those Bronco II owners whose vehicles are discovered to have been modified in a manner that alters handling characteristics or whose vehicles have worn suspension components. The cost sharing item is the only new aspect, and several items previously offered as "inspection incentives," e.g. a hand lantern and cellular phone, are no longer included in the package.

One factor that influenced my rejection of the first settlement was that the first settlement package provided none of the relief sought by plaintiffs in the Complaint, i.e., repayment of the Bronco II purchase price, compensation for diminution in value of the Bronco II, and/or an injunction requiring Ford to recall or retrofit all Bronco IIs.[10] The same is true of the second proposed

**6.** Plaintiff class counsel at the time were Richard A. Freese of Birmingham, Alabama and T. Roe Frazer II of Jackson, Mississippi.

**7.** The Alabama state court action, *Rice v. Ford Motor Co.*, is pending in Greene County court on behalf of a class of Alabama purchasers.

**8.** I held status conferences on October 2 and November 7 and 15, 1996.

**9.** Alabama counsel have not participated in the discovery or motion practice in these consolidated proceedings, although they have sought to take part in the proposed global settlement.

**10.** March 20, 1995 Memorandum and Order

settlement package. The addition of the cost sharing item does not alter this finding. Even if consumers take advantage of the inspection and discounted repairs, the services offered will, at most, merely return the vehicles to their pre-modified condition—a condition that the plaintiffs allege in their complaint is defective. Neither does the educational benefit, which plaintiff counsel laud, provide the relief sought in the complaint.

While I will avoid commenting on the merit or value of plaintiffs' claims [11] in addressing approval of the settlement, I must determine whether, accepting that there is some level of uncertainty in plaintiffs' case, plaintiffs nevertheless are receiving sufficient consideration in view of the relief requested in the complaint and in exchange for the complete release of all of their consumer-related claims. I am not convinced that they are receiving something of sufficient value here. Neither the settlement agreement, notice, or any other related documents purports to place a monetary value on the package. Counsel for plaintiffs and Ford have candidly admitted that it is difficult if not impossible to place such a value on the package. Nevertheless, they point to the inspection and cost-sharing component as having **some** monetary value. However, the cost-sharing component contemplates expenditure of what ultimately may be hundreds, and possibly thousands, of dollars of the putative class members' own money at a Ford or Lincoln/Mercury dealer, representing what at least appears to be more of a potential benefit to **Ford** than to the putative class members.

Finally, the attorney fee and expense petition that plaintiff counsel plan to submit for approval references a sum so far out of the range of what I consider reasonable as to suggest that, despite actual discovery effort by local plaintiff counsel, collusion problems remain. As already explained, when plaintiff counsel submitted their fee and expense estimate in October 1996, which totaled approximately $1.6 million, I told them I found it incomprehensible that the award would approach anywhere near that sum. Three months later, the settlement submitted for

preliminary approval cited $6 million as the figure plaintiff counsel would request in fees and expenses. This is $2 million more than the sum which, in 1995, I found unconscionable and suggestive of collusion. It is $4.4 million more than the $1.6 million estimate submitted by plaintiff counsel in October 1996, an estimate I already considered excessive even in view of the discovery that had taken place since the 1995 settlement.

Local plaintiff counsel has attempted to explain the $4.4 million discrepancy by pointing out that the October 1996 estimate did not include the estimated fees and expenses of Alabama plaintiff counsel, whose clients desire to participate in the settlement although they have not otherwise participated in these consolidated pretrial proceedings. Plaintiff counsel further urges that the difference now is that they agree that despite the figures sought by them as attorney fees and expenses, ultimately I have the authority to award whatever sum I find appropriate and reasonable. I simply am not convinced that such a provision in the settlement agreement will remove the taint in the settlement negotiations suggested by the terms of the meager recovery the plaintiff class receives when compared to the fee request. Although local plaintiff counsel advise that they are willing to submit to binding arbitration of the fee issue, Alabama counsel refuse to do so, suggesting that the settlement provision declaring counsel's deference to my award is effectively meaningless. In essence, then, I am in the same position I was in two years ago.

Whereas two years ago I was willing to approve the settlement as a preliminary matter and engage in the entire fairness hearing process, to do so again would be a costly and futile process under the circumstances. I therefore chose not to approve the proposed settlement even preliminarily, and so ordered on January 31, 1997.

---

(Record Doc. 160) at pp. 13–14.

**11.** I find particularly troubling certain public statements made by Alabama plaintiff counsel to

the effect that it is impossible to prove that their clients have sustained any damage. Milo Geyelin, *Ford Reaches a New Settlement in Bronco II Rollover Litigation*, Jan. 30, 1997 at B12.