**Stuart HANLON, Plaintiff,**

**and**

**Kenneth Edwards; Nancy Edwards; Kathy Hancock; Michael Hancock; Lori Tuttle; Paul Alan Levy; Nancy Huvendick; Center For Auto Safety, Intervenors–Appellants,**

**v.**

**CHRYSLER CORPORATION, a Delaware corporation, Defendant–Appellee.**

**Stuart HANLON, Plaintiff,**

**and**

**Robert Kempton, Plaintiff–Appellant,**

**and**

**George Van Buskirk, Objector; Diane Cheatham, Objector, Appellants,**

**v.**

**CHRYSLER CORPORATION, a Delaware corporation, Defendant–Appellee.**

**Stuart HANLON; Billy Macables; Lewis Amonette; June Amrhein; Richard Bales; Ray Baranowski; Lynette Barrera; Larry Beasley; Steven Bell; Sue &**

---

a document the Basts submitted as a "supplemental excerpt of record" is denied.

Stanley Bell; Angie Blain; Robert Bowman; Gail Broadway; Elizabeth Callais; Ann Caples; Steve Cathey; Allison Clay; George Clifford; Max Colvin; Karen & Ryan Courtade; George Cowsar; William Dalrymple; Greg Davis; Linda De Muro; Dennis Dean; Cheryl Deegan; James Deming; Bill Dippel; Chris Dixon; Jerry Donelson; Allen Douglass; Mary Douglass; Sandra Edwards; E.W. Ellison, Jr.; Al Fairley; Jerry Ferguson; Noah Ferrell; Benjamin Ferrydene; Jeanette Fisher; Steve Fontenot; Steven Franks; Thomas Gonda; Joseph & Jeanne Graham; Tammy Grantham; James Haffey; Della Hamilton; Michelle & Jay Hare; Cheryl Hensley; Sherman Hyatt; Carl Jackson; Diann James; Isaac Jarrett; Kamal Kabshura; James Kaigler; Paul L. Kennedy; Sandra King; Judith Koinm; John Langford; Laura Leathers; Walter Legers; Linda Lewandowski; Joseph Lewandowski; Thomas Look; Margaret Maddox; Roosevelt March; Debra Mason; Zandra Mcbride; Nancy Mcmanus; Adrian Millwood; Wendy & John Minerowicz; D. Mitchell; Starkey Morgan; Ana Nadim; Tim Nolan; Katie Nutall; Carey O'neal; Harry & Becky Pepper; David Ramsey; Teresa Ruiz; J.R. Sanders; Wilton Sanders; George Shackleford; A.J. Sims; Elaine Sims; Eileen Siss; William Spell; Dewey Stancil; Robert Stengl; Kevin Stevens; Denise Storey; Donna Strichter; Melanie Tichenor; Ed Turnage; Ralph Ulery; Sally Ulery; Robert Ware; Christine White; Darrell Whitten; Terrell Williams; Ramona Williams; Sidney Wilson; Stacy Wilson, Plaintiffs–Appellees,

and

C. Stuart McPherson, Objector; Robert Mendoza, Objector; Gloria Mendoza, Objector; Michael Rubin, Objector; Roderick Thornton, Objector; Peter Von Savoye, Objector, Appellants,

v.

CHRYSLER CORPORATION, a Delaware corporation, Defendant–Appellee.

Stuart HANLON, Plaintiff–Appellee,

and

George Van Buskirk, Objector; Diane Cheatham, Objector; Robert Kempton, Appellants,

v.

CHRYSLER CORPORATION, a Delaware corporation, Defendant.

Nos. 96–15043, 96–15044, 96–16027, 96–16076.

United States Court of Appeals, Ninth Circuit.

Submitted Aug. 13, 1997.

Decided June 9, 1998.

Amended July 24, 1998.

Colette G. Matzzie, Washington, DC, for objectors-intervenors-appellants.

James E. Carter, Madison, GA, for objectors-appellants.

Charles A. Newman, Bryan Cave, St. Louis, MO, for defendant-appellee.

1. The Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by

Elizabeth J. Cabraser, Michael F. Ram, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, for plaintiffs-appellees.

William M. Rubenstein, Asst. Atty. Gen. of Connecticut, Hartford, CT, for Amicus Curiae States of Connecticut, Arizona, Iowa, Kansas, New York, Nevada, Oklahoma, Pennsylvania, Rhode Island and Vermont.

Before: GOODWIN and THOMAS, Circuit Judges, SEDWICK,[1] U.S. District Judge.

THOMAS, Circuit Judge:

We are presented in this appeal with procedural and substantive objections to the settlement of a nationwide class action against Chrysler Corporation. After examining the settlement in accordance with the guidelines established in *Amchem Products, Inc. v. Windsor*, —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), we affirm the district court.

I.

In September 1993, the National Highway Traffic Safety Administration ("NHTSA") Office of Defect Investigation learned of a rear liftgate latch problem in 1992 Chrysler minivans. NHTSA opened a preliminary investigation, which was expanded to an "engineering analysis" of all 1984–1994 Chrysler minivans. The Engineering Analysis included a technical evaluation of the rear latches, testing of the latches in different scenarios, and analyzing accidents, fatalities, injuries and consumer complaints. Despite NHTSA's investigation, Chrysler publicly denied any problem with its rear liftgate latches.

The NHTSA investigation proceeded throughout 1994. On November 17, 1994, Chrysler and NHTSA representatives met to discuss the engineering analysis and the

designation.

growing evidence that the latches presented a serious safety threat. Following that meeting, NHTSA and Chrysler negotiated a voluntary resolution to the investigation wherein Chrysler announced a "Service Action" to replace the rear liftgate latches on all 1984–1994 minivans. The Service Action was extended one month later to include 1995 minivans.

The details of the Service Action are found in the correspondence exchanged between Chrysler and NHTSA; Chrysler understood its campaign to include:

- a redesigned improved replacement latch to be installed free of charge;

- a series of letters to minivan owners advising them the new latches were available;

- an advertising campaign;

- monitoring the response rate of owners and taking all necessary steps to ensure an appropriate response rate; and

- quarterly reports to NHTSA.

NHTSA kept its investigation open after Chrysler initiated the Service Action to ensure the company's compliance. The investigation was finally closed on October 25, 1995. At that time, NHTSA was satisfied that the voluntary action taken by Chrysler had been as effective as a formal recall. However, NHTSA reserved the right to reopen the proceedings and initiate a recall if Chrysler's Service Action proved inadequate or if Chrysler abandoned the plan.

Prior to the agreement between NHTSA and Chrysler, plaintiffs lawyers in several states filed class actions in various state courts seeking latch replacement, as well as damages under various state-law warranties and theories of recovery.[2] The plaintiffs' counsel in the state actions met with engineering experts, conducted and defended depositions, and were proceeding through the normal course of document-intensive discovery. Class counsel in the two California cases and the Texas case moved for class

certification; however, the hearings were continued at Chrysler's request.

Approximately two weeks before it announced the NHTSA-approved Service Action, Chrysler and counsel from the various state actions began serious settlement discussions, which continued throughout April, May and June 1995. As a result of the settlement discussions, all of the state class actions were consolidated in one large national class action (the *Hanlon* class) in federal court in the Northern District of California under Judge Legge on June 16, 1995. In their complaint the *Hanlon* plaintiffs asserted various claims against Chrysler with regard to an alleged defect in the rear liftgate latches of the minivans. Three days after filing the case, the parties submitted a settlement agreement to the court for approval. The district court held a preliminary hearing on the settlement agreement on August 18, 1994, and issued an Order granting preliminary approval of the settlement and certifying the nationwide class of Minivan owners for settlement purposes only. All personal injury and death cases are excluded from this settlement.

> The Order also provided at Paragraph 19: Pending final determination of whether the settlement embodied in the Settlement Agreement is to be approved, no member of the Settlement Class, either directly, representatively, derivatively, or in any other capacity, shall commence or prosecute any action or proceeding in any court or tribunal asserting any of the claims described in paragraph 17 of the Settlement Agreement.

Pursuant to the August 18 Order, the Court-approved notice of the proposed settlement was mailed directly to over 3.3 million Minivan owners. The order granting preliminary approval of the settlement set an objection and opt-out date of October 20, 1995, and all activity on the state actions ceased.

A few weeks after the *Hanlon* action was filed, Robert Kempton, a resident of Georgia and Chrysler minivan owner, filed a similar class action in a Georgia state court. Kempton sought to represent himself and all Geor-

---

**2.** The Louisiana action, the first state action to commence, was filed in April 1994. It was followed by actions in Alabama (filed April 1994),

Texas (filed in June 1994), California (two actions filed in December 1994), and New York (filed in March 1995).

gia residents and entities who purchased or leased a Chrysler minivan in the relevant product years. In direct contravention of the federal district court's August 18 order, Kempton filed a motion to certify the Georgia class on October 17, 1995. Kempton specifically stated that his goal was either to opt out all Georgia residents from the *Hanlon* action or object on their behalf. The *Hanlon* plaintiffs and Chrysler filed a motion to enjoin Kempton from proceeding, and the California district court issued such an order on October 19, 1995.

Kempton expressly ignored the injunction and proceeded with the Georgia class certification, arguing that he had opted out of the *Hanlon* class and therefore was not subject to that court's jurisdiction or bound by its orders. The Georgia state judge entered an order conditionally granting Kempton's motion and certifying the class.

Following notification of the proposed settlement, the district court in California conducted two fairness hearings on the adequacy of the settlement in November 1995. The court made several findings at the second hearing on November 30, 1995, indicating its approval of the settlement. Prior to entering the order, the court gave objectors an opportunity to present arguments on the pending settlement. The objections centered around one primary issue: the adequacy and fairness of the settlement in light of Chrysler's prior agreement with NHTSA to replace all of the defective latches. At the conclusion of the hearing, the court entered a final order of settlement and award of attorneys fees.

In early 1996, Chrysler acknowledged that approximately one million class members never received the notice of settlement and opportunity to opt-out of the settlement class because it had inadvertently failed to include them in the initial mailing. As a result, Chrysler moved to set aside the final order of settlement and reopen the proceedings to allow additional notice to these class members. The court agreed and granted Chrysler's Rule 60(b) Motion to Partially Reopen the Judgment on February 23, 1996.

A third and final fairness hearing was held on April 29, 1996. At the close of that hearing, the court issued a new order that was substantially similar to the November 30 order. The objectors timely appealed to this court.

## II.

In recent years, the difficulties attendant to consummating settlement of mass tort and consumer lawsuits have caused litigants to instigate lawsuits for the limited purpose of obtaining court approval of a certified class settlement. Although there is nothing inherently wrong with this practice, we must pay "undiluted, even heightened, attention" to class certification requirements in a settlement context. *Amchem Products, Inc. v. Windsor,* ─── U.S. ───, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997) ("*Amchem* ").

### A.

Our threshold task is to ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Id.* 117 S.Ct. at 2245. The prerequisite of numerosity is discharged if "the class is so large that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). None of the objectors contest certification for failure to meet this condition, and as a nationwide class with millions of class members residing in fifty states, this requirement is clearly satisfied.

A class has sufficient commonality "if there are questions of fact and law which are common to the class." Fed.R.Civ.P. 23(a)(2). The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class. Although members of the proposed class in this instance may possess different avenues of redress, their claims stem from the same

source: the allegedly defective designed rear liftgate latch installed in minivans manufactured by Chrysler between 1984 and 1995. Thus, the proposed class shares sufficient factual commonality to satisfy the minimal requirements of Rule 23(a)(2).

■■■ The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ.P. 23(a)(3). Under the rule's permissive standards, representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. In this instance, the broad composition of the representative parties vitiates any challenge founded on atypicality. The representative parties comprise persons from every state, representing all models of Chrysler minivans and include minivan owners whose latches remain operable. The narrow focus of the proposed class was to obtain a defect-free rear liftgate latch in Chrysler minivans owned by class members, or receive adequate non-personal injury compensatory damages. Given these limited objectives and the broad composition of the representative parties, the representative claims were sufficiently typical to pass muster under Rule 23(a)(3).

■■■ The final hurdle interposed by Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them. See Hansberry v. Lee, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? See Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

■■■ Examination of potential conflicts of interest has long been an important prerequisite to class certification. That inquiry is especially critical when the a class settlement is tendered along with a motion for class certification. Amchem instructs us to give heightened scrutiny to cases in which class members may have claims of different strength.

Amchem was a settlement class action which attempted to settle all pending and future asbestos litigation. The asbestos manufacturers wished to resolve all claims, including those not yet filed or even in existence at the time of the settlement. The class was never divided into sub-classes and additional counsel was never appointed to represent the interests of plaintiffs with as yet undeveloped or undiagnosed injuries. Despite these problems, the class was conditionally certified and the settlement approved.

The Third Circuit vacated the certification because the requirements of Rule 23 were not met independent of the settlement agreement. Georgine v. Amchem Products, Inc., 83 F.3d 610, 617–618 (3d Cir.1996). The Supreme Court affirmed. Amchem Products, Inc. v. Windsor, —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The Court found that the clashing interests of present and future claimants presented insurmountable conflicts for class counsel who could not possibly provide adequate representation to both groups as required by Rule 23(a)(4). Id. 117 S.Ct. at 2251. The Court also held that all of the Rule 23 standards for class actions must be met without regard to the presence or terms of a pending settlement agreement. Id. at 2249.

At the heart of Amchem was concern over settlement allocation decisions; asbestos manufacturers had a designated amount of money that was not fairly distributed between present and future claimants. The Amchem settlement eliminated all present and future claims against asbestos manufacturers, with class counsel attempting to represent both groups of plaintiffs. The Supreme Court found this dual representation to be particularly troubling, given that present plaintiffs had a clear interest in a settlement that maximized current funds, while future plaintiffs had a strong interest in pre-

serving funds for their future needs and protecting the total fund against inflation.

■ Unlike the class in *Amchem,* this class of minivan owners does not present an allocation dilemma. Potential plaintiffs are not divided into conflicting discrete categories, such as those with present health problems and those who may develop symptoms in the future. Rather, each potential plaintiff has the same problem: an allegedly defective rear latchgate which requires repair or commensurate compensation. The differences in severity of personal injury present in *Amchem* are avoided here by excluding personal injury and wrongful death claims. Similarly, there is no structural conflict of interest based on variations in state law, for the named representatives include individuals from each state, and the differences in state remedies are not sufficiently substantial so as to warrant the creation of subclasses. Representatives of other potential subclasses are included among the named representatives, including owners of every minivan model. However, even if the named representatives did not include a broad cross-section of claimants, the prospects for irreparable conflict of interest are minimal in this case because of the relatively small differences in damages and potential remedies.

To further forfend problems caused by potential subclass differences, the actions and tendered settlement were narrowly circumscribed. No personal injury or wrongful death claims were included, and any class member who wished to do so could opt out of the settlement class. To fulfill this limited purpose, the proposed settlement does not propose different terms for different class members; on the contrary, treatment of each class member is identical. Given these careful precautions and safeguards, no improper conflict of interest existed which would deny absent class members adequate representation.

■ Our second adequacy inquiry is directed to the vigor with which the named representatives and their counsel will pursue the common claims. Although there are no fixed standards by which "vigor" can be assayed, considerations include competency of counsel and, in the context of a settlement-only class, an assessment of the rationale for not pursuing further litigation.

■ The objectors do not seriously challenge the competence of class counsel, and the record dispels any cause for concern. Affidavits submitted to the district court show experience prosecuting dozens of high profile class action cases and products liability litigation. If these attorneys are not equal to the task of prosecuting this case, it is not clear to us who would be. The objectors presented no evidence, and we could find none in the record, to indicate any deficiencies or conflicts of interest on the part of class counsel.

■ The *Amchem* Court also noted the problem of counsel "not prepared to try a case." Such counsel is, almost by definition, inadequate because an inability or unwillingness to try a case means the class loses all of the benefits of adversarial litigation. "Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer." *Amchem,* 117 S.Ct. at 2248–2249. District courts must be skeptical of some settlement agreements put before them because they are presented with a "bargain proffered for ... approval without benefit of an adversarial investigation." *Id.* at 2249.

■ These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded. *See, e.g., In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir.), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

These circumstances are not present in this case. Class counsel prosecuted several state class actions in strategic states prior to the filing of the federal consolidated action. They conducted the initial factual investigation, even prior to learning of the NHTSA investigation. They consulted and retained automotive and engineering experts to assess the design specifications, blueprints,

and other Chrysler documentation relating to the minivans. They assessed the failure mode commonly experienced and corroborated that the reported failures were due to defective latch design. They reviewed Chrysler's history of advertising the minivan as a "safe family vehicle" in order to assess any implied or express warranties and possible misrepresentation claims. They engaged in the traditional discovery of products liability litigation, including document request and production, interrogatories, and the taking and defending of depositions. They fought Chrysler's requests for protective orders, successfully resisted Chrysler's attempts to remove the various actions to federal court, and its attempt to transfer all of the cases to an MDL proceeding. Plaintiffs' counsel spoke and conferred regularly to coordinate their litigation. strategy and to apply as much pressure as possible to Chrysler. We find counsel's prosecution of the case sufficiently vigorous to satisfy any Rule 23(a)(4) concerns.

In sum, the named representatives have fulfilled the threshold requirements of Fed. R.Civ.P. 23(a) by satisfying the preconditions of numerosity, commonality, typicality, and adequacy of representation. The named plaintiffs have also satisfied the heightened scrutiny we must give to Rule 23(a) requirements when considering certification of a settlement-only class.

### B.

■ In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed.R.Civ.P. 23(b)(1), (2) or (3). *Amchem,* 117 S.Ct. at 2245. In the instant case, the parties propose certification pursuant to Rule 23(b)(3), which is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1777 (2d ed.1986). To qualify for certification under this subsection, a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: common questions must "predominate over any questions affect-

ing only individual members," and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

■ "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 117 S.Ct. at 2249. This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Wright, Miller & Kane, *supra,* § 1778. Settlement benefits cannot form part of a Rule 23(b)(3) analysis; rather the examination must rest on "legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem,* 117 S.Ct. at 2249.

■ A common nucleus of facts and potential legal remedies dominates this litigation. Variations in state law do not necessarily preclude a 23(b)(3) action, but class counsel should be prepared to demonstrate the commonality of substantive law applicable to all class members. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821–23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. On the contrary, to the extent distinct remedies exist, they are local variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and "lemon laws." Individual claims based on personal injury or wrongful death were excluded from the class. Thus, the idiosyncratic differences between

state consumer protection laws are not sufficiently substantive to predominate over the shared claims. Indeed, at the November 30, 1995 fairness hearing, the objectors acknowledged that independent of any variations in state law, there were still sufficient common issues to warrant a class action, particularly questions of Chrysler's prior knowledge of the latch deficiency, the design defect, and a damages remedy.

Rule 23(b)(3) also requires that class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case. Wright, Miller & Kane, *supra* § 1779. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution. In this instance, the alternative methods of resolution are individual claims for a small amount of consequential damages or latch replacement. Further, the statute of limitations has run for owners of older vehicles under many state laws, and state lemon laws almost universally require that the vehicle be defective beyond repair—a condition which is impossible for many owners to demonstrate. Thus, many claims could not be successfully asserted individually. Even if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs. In most cases, litigation costs would dwarf potential recovery. In this sense, the proposed class action is paradigmatic. A fair examination of alternatives can only result in the apodictic conclusion that a class action is the clearly preferred procedure in this case.

Assessment of the non-exclusive factors listed in Rule 23(b)(3) which potentially apply to both the predominance and superiority inquiries yields the same result. From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery. With a few exceptions, the pre-existing lawsuits were cooperatively managed and can be effectively merged into the instant action. No particular forum stands out as a logical venue for concentration of claims. Thus, consideration of the factors enumerated in Rule 23(b)(3) does not alter the conclusion.

Thus, given the limited focus of the action, the shared factual predicate and the reasonably inconsequential differences in state law remedies, the proposed class was sufficiently cohesive to survive Rule 23(b)(3) scrutiny. A comparative examination of alternatives underscores the wisdom of a class action in this instance. Consideration of the specific, non-exclusive factors identified in Rule 23(b)(3) produces the same result. Thus, the requisite predominance and superiority tests are satisfied, and the conditions of Rule 23(b)(3) have been met.

### C.

The objectors claim error in the brevity of the district court findings, and the district court was, to say the least, restrained and succinct in explaining its reasoning. However, as the Supreme Court has stated, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim...." *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). This is just such a case. The record is fully developed, the issues are plain and the analytical framework clear. All the parties, including the objectors, have been represented on appeal by skilled advocates who have exhaustively briefed and argued the salient questions. Although the district court's findings are almost conclusory, the record provides more than adequate foundation upon which to reach our conclusions. There is no value to be served in remanding this case for the entry of further self-evident findings. The parties seeking certification have quite clearly satisfied the requirements of Rule 23(a) and Rule 23(b)(3), and the district court did not abuse its discretion in certifying the class. *Hilao v. Estate of Marcos,* 103 F.3d 767, 774 (9th Cir.1996). *Amchem* cautioned against conflating the class certification re-

quirements of Fed.R.Civ.P. 23(a) and (b) into the "fair, adequate and reasonable" preconditions for class settlement pursuant to Fed. R.Civ.P. 23(e), and mandated heightened scrutiny of proposed settlement-only class certifications. We have independently analyzed the proposed class with these admonitions in mind, and find no fault with district court's class certification even under these rigorous standards.

## III.

 After the federal consolidated class action was filed, but before the settlement agreement was presented to the district court for preliminary approval, Robert Kempton filed a state class action in Georgia. Kempton's theory of recovery was very similar to that of the federal action, but he claimed relief under Georgia state law. He sought to represent himself and all other Georgia consumers who owned or leased a minivan from the relevant model years, and asserted the right to opt-out all Georgia customers from the federal class action.

The district court expressly held that Kempton's actions in proceeding with his state class action, in direct contravention of the district court's injunction against such a proceeding, operated to exclude him from the nationwide class, but his opt-out had no effect on the remaining Georgia class members. Kempton argues on appeal that the district court erred, that his actions were taken on behalf of all Georgia class members, and that the state court's certification of the Georgia action operates to opt-out all Georgia class members from the plaintiff class.

 The district court was entirely correct. All class members in a Rule 23(b)(3) action are entitled to due process, including notice. *Phillips Petroleum v. Shutts*, 472 U.S. 797, 810–813, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The procedural due process rights of these members include an opportunity to be excluded from the action. The right to participate, or to opt-out, is an individual one and should not be made by the class representative or the class counsel. *See* Newberg and Conte, *Newberg on Class Actions*, § 16.16 at 90 (3d ed. 1992) ("The decision to exercise the right of exclusion in a

Rule 23(b)(3) action is an individual decision of each class member and may not be usurped by the class representative or class counsel.") There is no class action rule, statute, or case that allows a putative class plaintiff or counsel to exercise class rights en masse, either by making a class-wide objection or by attempting to effect a group-wide exclusion from an existing class. Indeed, to do so would infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Additionally, to allow representatives in variously asserted class actions to opt a class out without the permission of individual class members "would lead to chaos in the management of class actions." *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 412 (2d Cir.1975). In this case, all members of the purported Georgia class were notified of this class action and the proposed settlement, and all but twenty-eight elected to remain in the class. By contrast, there is no evidence in the record that any Georgia class member received notice of the Kempton suit and made an intelligent election to join or decline to participate in it.

Kempton relies on *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 14 F.3d 151 (2d Cir.1994), to support his notion of a statewide opt-out on behalf of all Georgia class members, regardless of their individual preferences or actions. His reliance on this case is misplaced, however, as it provides no support for his contention that his power as a named state class representative allows him to act on behalf of all other state class members in a nationwide suit and exercise their opt-out rights for them. Rather, in that case the three groups of victims all possessed liquidated judgments or settlements which were in existence and final *prior to* the filing of the class action. The Second Circuit held that it was in the discretion of the trial court to deem subclasses which had obtained prior settlements or judgments to have opted out of the new class because their rights had been determined previously. *Id.* at 156. That theory is inapplicable to cases such as

this in which the separate action is filed subsequently and the rights of the putative subclass have not been determined.

▮ In addition, the temporary approval of the nationwide settlement stayed the state class actions. The federal court had the power to issue an injunction against continued state proceedings under the All Writs Act, 28 U.S.C. § 1651 ("[t]he All Writs Act ... empowers the federal courts to enjoin state proceedings that interfere, derogate, or conflict with federal judgments, orders, or settlements." *Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir.1997)) and the Anti-Injunction Act, 28 U.S.C. § 2283 (a federal court may intervene and enjoin state court proceedings in three narrow circumstances, one of which includes when it is necessary to protect the court's jurisdiction). Although comity requires federal courts to exercise extreme caution in interfering with state litigation, federal courts have the power to do so when their jurisdiction is threatened.

▮ Further, Fed.R.Civ.P. Rule 23(d) vests a district court with the authority and discretion to protect the interests and rights of class members and to ensure its control over the integrity of the settlement approval process. "[A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

▮ Because a class representative in a state class action, acting at the same time as a federal class action, lacks the power to opt-out an entire class without the permission of individual class members, the district court properly ruled that Kempton's actions served as an individual opt-out for Kempton alone.

### IV.

Having concluded independent of settlement considerations that the proposed class passes certification muster, our analysis must turn to the proposed settlement itself. In that determination, we are guided by Rule 23(e) which provides:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in a manner as the court directs.

### A.

▮ Adequate notice is critical to court approval of a class settlement under Rule 23(e). In this case, the notice provided to the absent class members provided each member with the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery. The objectors contended at oral argument that even if the notice provided to the class met the requirements of Rule 23(c)—which it clearly did—the absent class members still did not understand what they were giving up. There is no evidence of such wide-scale confusion or ignorance in the record.

On the contrary, the text of the notice plainly stated:

> If the proposed settlement is approved, it will be binding and will release Chrysler from any and all claims, including any claims for consumer damages or equitable relief, arising out of or related to the Minivan rear liftgate latches, that were or could have been asserted by Settlement Class members in the Hanlon lawsuit. In addition, if the proposed settlement is approved, it will release any and all claims, arising out of or related to the Minivan rear liftgate latches, that were or could have been asserted for Settlement Class members in certain class action lawsuits pending in various state courts around the United States. The proposed settlement does not, however, release, dismiss, or affect any claims for personal injury or wrongful death as an alleged result of the rear-door latch on the Minivans.

The notice resulted in approximately 971 members of the class exercising their opt-out right. This number reveals two things: (1) at least some portion of the class understood the notice and chose not to participate in the settlement for whatever reason; and (2) the vast majority of the class—over 99.9%—

agreed to be bound. This is how Rule 23 works, and we decline any opportunity to rewrite it by implication.

The individual notice sent to each minivan owner, coupled with the pre-trial publicity, NHTSA actions, and nationwide dealer participation was sufficient to bring the urgency of the action to each class member's attention. There is no evidence that the settlement proposed and accepted by the district court did anything to advance the rights of one group of claimants over another and plaintiffs who were at risk of losing what they deemed valuable claims had an opportunity to protect their interests.

### B.

■ Fed.R.Civ.P. 23(e) requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable. *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir.1992). Our review of the district court's decision to approve a class action settlement is extremely limited. *Id.* It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness. *Officers for Justice v. Civil Serv. Comm'n of San Francisco,* 688 F.2d 615, 628 (9th Cir.1982). Neither the district court nor this court have the ability to "delete, modify or substitute certain provisions." *Id.* at 630. The settlement must stand or fall in its entirety. *Id.*

■ Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.1993), *quoting Officers for Justice,* 688 F.2d 615, 625 (9th Cir.1982). To survive appellate review, the district court must show it has explored comprehensively all factors. *See Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

■ Several circuits have held that settlement approval that takes place prior to formal class certification requires a higher standard of fairness. The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a courtdesignated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e). This is the position adopted by the Third Circuit in *GM Pick-Up Litig.,* 55 F.3d at 805 ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified."); the Second Circuit in *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982) ("district judges who decide to employ such a procedure are bound to scrutinize the fairness of the settlement agreement with even more than the usual care"); and the Seventh Circuit in *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust,* 834 F.2d 677, 681 (7th Cir.1987) ("*Simer* and *Weinberger* emphasize ... that when class certification is deferred, a more careful scrutiny of the fairness of the settlement is required. We agree...."). *See also Manual for Complex Litigation* § 30.45 (3rd. ed. 1995) ("Approval under Rule 23(e) of settlements involving settlement classes ... requires closer judicial scrutiny than approval of settlements where class certification has been litigated.") No circuit has held to the contrary. Because settlement class actions present unique due process concerns for absent class members, we agree with our sister circuits and adopt this standard as our own.

■ We have repeatedly stated that the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is "exposed to the litigants, and their strategies, positions and proof." *Officers for Justice,* 688 F.2d at 626 (internal quotation omitted). The district court held a hearing in August 1995 in which it granted

preliminary approval of the settlement agreement and approved a class-wide notice. Two fairness hearings followed in November 1995, and a third was held in April 1996. The transcripts of the hearings reveal an exhaustive presentation by the objectors raising virtually all of the issues noted in the briefs and in oral argument before this court.

In approving the settlement under Rule 23(e), the district court noted that the class was not giving up any right to challenge the adequacy of the replacement latch and was relieved from any duty to prove that the original latch was defective. The monitoring by class counsel and the additional outreach provided by Chrysler also worked in favor of the class in terms of extended notification and the fulfillment of all terms. The district court also retains jurisdiction over the implementation of the settlement. Class counsel may return to court if Chrysler is not using its "best efforts" to obtain the latch replacement goals or if the outreach and notification funds are allocated or spent in an inappropriate manner. The court also recognized that the alternatives to settlement were not promising; the parties could return to the bargaining table but that was no guarantee that the class would receive a better deal. Allowing the state court actions to proceed put the entire class at risk of "balkanized decisions" and high expenses—the only benefit being that "a few people would get a little more money."

The judge's decision to approve the settlement was correct on the merits, and reflected the proper deference to the private consensual decision of the parties. As we noted in *Officers for Justice*, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id.* at 625. The fairness hearings support such a finding.

There is no evidence to suggest that the settlement was negotiated in haste or in the absence of information illuminating the value of plaintiffs' claims. In fact, settlement negotiations began several months prior to the filing of the consolidated federal action and included numerous meetings. No evidence of collusion was presented to the district court or otherwise evident in the record.

The settlement presented to the district court obligates Chrysler to make the minivans safe. This fact alone sets this case apart from *GM Pick–Up Litig.* and *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 981 F.Supp. 969 (E.D.La.1997)—cases in which a settlement agreement was rejected in large measure because it did nothing to remedy the safety problem with the vehicles. Again and again, the objectors reiterated that their primary concern was the safety of the vehicles and the prevention of injury. Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable or adequate. Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion. In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness. There was no disparate treatment between class members; all stood to benefit equally, a fact which lessens the likelihood that the named plaintiffs and their attorneys colluded with Chrysler to increase their own recovery at the expense of the unnamed plaintiffs who class counsel had a duty to represent. No objector stepped forward and suggested that his or her personal claim was being sacrificed for the greater good—and if any thought that was the case, they had the right to opt-out of the class.

The district court's final determination to approve the settlement should be reversed "only upon a strong showing that the district court's decision was a clear abuse of discretion." *In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 377 (9th Cir.1995) (internal quotation omitted). There was no such showing here.

## C.

 Several state Attorneys General,[3] acting as amicus curiae, contest one paragraph of the settlement agreement.

Paragraph 24 of the agreement provides:

¶ 24. **Government Actions Affecting Settlement.** If any administrative proceeding or action is commenced by any federal (except NHTSA), state or local governmental authority in a *parens patriae* function (and not in its capacity as an owner of any Minivan that has opted-out of the Settlement Class) asserting claims within the scope of the Action, the Class Plaintiffs and Settlement Class Counsel shall intervene in that action at the request of Chrysler. They shall intervene to fully support Chrysler by asserting that the governmental action is within the scope of this agreement, the Class Action Complaint, and the judgment entered herein. Any time and expense incurred by the Class Plaintiffs and Settlement Class Counsel shall be deemed to be within the application(s) referenced in paragraph 14. Additionally, in the event any action is commenced by a governmental authority as stated in this paragraph, Chrysler shall have the option, in its sole discretion, to immediately suspend relief to citizens of that jurisdiction pending the outcome of the suit brought by the governmental authority.

The Attorneys General claim this provision is unfair and unreasonable because it will have a "chilling effect" on state enforcement. "For example," they claim, "if a governmental agency were to initiate an enforcement action relating to the defective latch or the latch replacement program, such as for deceptive advertising of the program, Chrysler would have the discretion to suspend relief in the applicable jurisdiction." The effect is to place relief "outside the control of the class" and dependent upon the actions of nonparties to the action.

Paragraph 24 survives for several reasons. First, paragraph 24 does not prohibit any government action. The attorneys general remain free to act as they see necessary to enforce the consumer laws of their state. Chrysler and Class counsel cannot not prohibit state enforcement and never argued they could. Any "chilling effect" on state enforcement that flows from the settlement agreement comes from the danger that Chrysler will decide to contest the state action, invoke paragraph 24 of the settlement, and impose a delay on minivan owners. The chilling effect then comes from the potential anger of class members—who knowingly agreed to the settlement provisions, including paragraph 24, did not opt out, and readily accepted the benefits of the agreement—at the attorney general of their state for interfering with their receipt of the benefits of the settlement. The only impact of paragraph 24 falls on the plaintiff class members and they have agreed—by their inclusion in the class—to assume the risk.

Second, paragraph 24 has been included in the Settlement Agreement from the beginning. Class members had notice that they were exchanging their state rights for the contractual promises of the Agreement and the vast majority of the class agreed. Class Counsel is required by the agreement to come forward and explain this fact in any state enforcement proceeding, an appearance that would most likely be helpful to a court, rather than a hindrance.

Third, paragraph 24 is limited to local, state or federal enforcement actions that are within the *scope of the settlement agreement.* If, for example, there was evidence of fraud in the advertising of the replacement latch program, this would not fall under the original complaint. As a result, the state attorneys general would be free to bring an action and Chrysler could not suspend relief.

Again, we reiterate that the district court was not free to redraft the agreement, or strike out certain parts it found to be problematic. We do not think the inclusion of paragraph 24 warrants rejection of the agreement.

---

**3.** The Attorneys General of Connecticut, Arizona, Iowa, Kansas, New York, Nevada, Oklahoma, Pennsylvania, Rhode Island, and Vermont joined in the amicus brief.

## V.

We review a district court's award of attorneys fees for an abuse of discretion. *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir.1994) ("*WPPSS*").

At Chrysler's insistence, class counsel and Chrysler did not negotiate or discuss attorneys fees until after the final settlement agreement was presented to the court. The parties then met with retired California Superior Court Judge Coleman Fannin in a fee mediation session. They eventually agreed to a fee of $5 million coupled with $200,000 in costs; Judge Fannin's affidavit indicated that he initially recommended this amount. The mediator's role did not include evaluating the benefits of the settlement so Judge Fannin had no way to ascertain whether $5 million was an appropriate percentage recovery. His affidavit was submitted only to certify that the figure was the result of legitimate arms-length negotiations.

Contrary to the objectors' contention, we do not believe the weight the district court gave to the mediation proceeding was an abrogation of its duty to determine independently whether the fee award was proper. Rather, the court relied on the mediator as independent confirmation that the fee was not the result of collusion or a sacrifice of the interests of the class, an inquiry the court was required to make. More importantly, Judge Legge appears to have reviewed the award using a lodestar methodology by requiring class counsel to submit detailed evidence of their work on behalf of the class. The choice of method for determining attorney fees is also reviewed for an abuse of discretion. *WPPSS*, 19 F.3d at 1296.

This court has affirmed the use of two separate methods for determining attorneys fees, depending on the case. In "common-fund" cases where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method. *Id.* at 1295. The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989). This circuit has established 25% of the common fund as a benchmark award for attorney fees. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990).

Although no class member is entitled to a cash recovery—making valuation of the settlement agreement more difficult—Chrysler and class counsel valued the settlement at $115 million. This is the amount Chrysler charged against its earnings in order to account for its voluntary service action and the production and installation of the replacement latches. The fee award of $5.2 million represents roughly 4.5% of this "common fund", significantly less than the 25% commonly used under *Six Mexican Workers*. We note, however, that the court rejected the idea of a straight percentage recovery because of its uncertainty as to the valuation of the settlement.

In employment, civil rights and other injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof. The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate. *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The hours expended and the rate should be supported by adequate documentation and other evidence; thus, attorneys working on cases where a lodestar may be employed should keep records and time sheets documenting their work and time spent. The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975).

Class counsel presented affidavits to the district court justifying their fees on the basis of their work on the individual state class actions. The fee award also includes all future services that class counsel must provide through the life of the latch replacement program. They must remain available to enforce the contractual elements of the settlement agreement and represent any class members who encounter difficulties. The

factual record provides a sufficient evidentiary basis for the district court's approval of the fee request. The lodestar calculation received further support from the mediator's recommendation, although we note that such a recommendation is never the starting point for calculation of a fee award. We find no abuse of discretion.

## VI.

The certification of the settlement class, the approval of the class settlement and the fee award were well within the guidelines provided by *Amchem* and Fed.R.Civ.P. 23. Accordingly, we affirm the judgment of the district court.