KLEINFELD, Senior Circuit Judge,
dissenting:
I respectfully dissent. This settlement perverts the class action into a device for depriving victims of remedies for wrongs, while enriching both the wrongdoers and the lawyers purporting to represent the class.
A. The Facts.

1. “Beacon.”

Millions of people connect themselves to their “friends” on Facebook. Some Face-book “friends” are friends in the traditional sense, people we know and like. Some are more in the nature of contacts, or acquaintances, or people we think may want to see what we post. For people who regularly use Facebook to communicate, “friends” may merely be their address book. The lead plaintiff in this case, Sean Lane, had over 700 Facebook “friends.” Facebook operates like a bulletin board, so that “friends” can see whatever a user chooses to post and not make private.
Facebook is “free,” furnished without a subscription price. The company makes money by selling advertising. To make such sales more lucrative, Facebook started a program called “Beacon” in November 2007. Like an actual beacon, the program shone light to make something easier to see: in this case, a user’s “friends” could see whatever he had bought from *827 companies that paid Facebook to participate in Beacon. Over forty companies signed up for Beacon, including Blockbuster, a movie retailer, Zappos, a shoe and clothing retailer, and Overstock.com, a discounter. If a Facebook user rented a movie from Blockbuster, for example, Facebook told all his Mends what movie he had rented. Facebook told retailers, “Facebook Beacon enables your brand or business to gain access to viral distribution within Facebook. Stories of a user’s engagement with your site.... will act as word-of-mouth promotion for your business and may be seen by friends who are also likely to be interested in your product.”
Many Facebook users strongly objected to losing the privacy of them purchases. After all, people ordinarily post on their Facebook page only what they want to post, and they had not elected to tell all their “Mends” what they had just bought. Some people buy things on the internet precisely because they want more privacy than they would have at a local store. Beacon took away their privacy, and broadcast their purchases to people who users wanted to remain in the dark.
Worse, Facebook made it very hard for users to avoid these broadcasts. The user had to actively opt out. And opting out required video game skills. The user would get a pop-up on his screen asking whether he wanted to opt out, but the pop-up would disappear in about ten seconds. Too slow reading the pop-up or clicking the mouse, and all a user’s “Mends” would know exactly what he had bought. Since the pop-up disappeared so quickly, someone looking at another window, or answering the phone, or just not paying attention, would likely not even be aware of the opt-out option before it disappeared.
Plaintiff Sean Lane alleges in the complaint that he bought a ring from Overstock.com as a surprise for his wife, but before he gave it to her, Facebook ruined the surprise by spreading the news to his over 700 “friends,” including many alumni in his college class. Ginger McCall states that her video rentals at Blockbuster were disclosed to all her “friends.” Of the vast number of people whose purchases were broadcast, no doubt some suffered embarrassment, and some suffered damage to employment, business, or personal relationships. Some Blockbuster rentals doubtless included erotica, some Overstock.com purchases probably included gifts meant to look more expensive than they were, and some Zappos purchases were probably more extravagant than purchasers’ spouses were aware. Someone who had told her college classmate that she could not attend her wedding because she could not afford the plane fare could lose a friend when Facebook told her classmate that she’d bought $400 shoes. Mr. Lane complains that his wife asked him about his ring purchase before he gave it to her, ruining his Christmas gift to her. His wife might also have been less impressed by the ring than he had hoped, since she and all his other friends could click a link and see that he had bought it cheaply — good for advertising Overstock.com, bad for advertising Mr. Lane’s generosity.
Many users’ private purchases were exposed, and over 50,000 complained. Within a few weeks (long before this lawsuit was filed), Facebook eliminated the opt-out Beacon program. Facebook changed it to an opt-in program, so that users did not need to maintain video game alertness to avoid disclosure to all their Mends. In the opt-in version of Beacon, purchases made in private stayed private unless the user expressly allowed Facebook to publicize them. One of the objectors to the settlement, Ginger McCall, says her movie rent *828 als were disclosed even after Beacon had supposedly changed to an opt-in, and no findings have been made on whether the opt-in worked or was tricky to operate.

2. The Settlement.

This lawsuit was filed in August 2008, about eight months after the opt-out version of Beacon had ended. The complaint challenged only the opt-out program that had lasted for a few weeks, not the opt-in version that had been in place since then. The parties mediated and settled, all before any class was certified. They agreed to end Beacon, both opt-in as it then was, and opt-out as it had been originally.
The settlement agreement approved by the district court (mistakenly, in my view) greatly changed the class aspect of the case. First, the parties agreed to certify the class for purposes of settlement. Second, they agreed to expand it far beyond what the complaint had sought. The complaint sought damages only for users affected during the few weeks when they had to opt out, but the settlement expanded the class to include everyone affected during the much longer opt-in period. Since the members of the class got no money from the settlement, the effect of certification and expansion was to bar any claims the expanded class might have, not to provide more people with recompense. In exchange for nothing, class members were barred from suing Facebook, Blockbuster, Overstock.com, or any of the other defendants for any claims arising from or relating to Beacon, “including, without limitation, arising from or related to data gathered from Beacon.” The majority states that Facebook promised never to revive the Beacon program, but this is not quite right. Face-book remained free to revive the program, even the cancelled version under which the subscriber had only a few seconds to opt out. The only limitation the settlement imposed was that Facebook had to call the Beacon program by some other name. The agreement said that Facebook would terminate “the Beacon Program,” and defined “Beacon” to mean “the program launched by Facebook on November 6, 2007 and all iterations thereof bearing the ‘Beacon’ name ” (emphasis added). The district judge asked about this term, and plaintiffs’ attorney expressly conceded that Facebook was free to reinstitute the same program under a different name. “[T]he problem was when you tried to describe the functionality and you preclude Face-book from using that functionality going forward, it becomes truly problematic and becomes impossible to reach an agreement because you’re limiting their ability to run them business.... At the end of the day, we could not reach agreement with defendants regarding limiting their future actions as a corporation.” That was an on the record concession that the injunction meant as little as it said, and Facebook remained free to do what it had done before, under a different name. The injunctive relief the class received was no relief at all, not even a restriction on future identical conduct.
Facebook users who had suffered damages from past exposure of their purchases got no money, not a nickel, from the defendants. Even those who had rented videos, and were arguably entitled to statutory damages of $2,500 for each disclosure,[1] got *829 nothing. Class counsel, on the other had, got millions. Plaintiffs’ lawyers and Face-book agreed that Facebook would not object to attorneys’ fees up to one third of what they called the “settlement fund.” One third would be a fee of $3,166,667. The fee would come out of the “settlement fund” and would not be in addition to it, so Facebook had no economic interest in reducing the amount. The fee actually approved by the district court was $2,322,763 plus costs of $42,210.58, 25% of the “settlement fund.” That $2.3 million payment was for getting their clients nothing and barring all the claims of a vastly broadened class.
Not a cent of the remaining “settlement fund” money would go to the Facebook users on whose behalf class counsel purportedly settled. The only exceptions were $10,000 to Mr. Lane, $5,000 each to two others, and $1,000 each to the other 19 named plaintiffs, amounting to $39,000 for the few people in the class who presumably had personally agreed to have class counsel represent them.
The remaining millions were to go to a new “privacy foundation” that did not yet exist. The board of the new foundation would be three directors to be agreed upon by Facebook and class counsel, or if they disagreed one chosen by each and the third chosen by those two. Under the agreement, all three directors could come from the Facebook advertising and sales staff if class counsel and Facebook so chose. The board of directors of this “privacy foundation” was to be advised by Facebook’s own lawyer and class counsel. The agreement provided that the “privacy foundation” was to use its millions to “fund projects and initiatives that promote the cause of online privacy, safety, and security” however its Facebook-friendly board chose.
B. Analysis.
The class action rule[2] was designed to facilitate lawsuits where individuals’ or small groups’ judgments would not add up to enough money to justify hiring lawyers, but judgments for large numbers of similarly situated victims of misconduct would. “The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone’s (usually an attorney’s) labor.”[3]
This procedural device has obvious attendant risks, because class counsel’s “clients” are not clients at all in the traditional sense; they do not hire the lawyer, they do not agree on a fee with him, and they do not control whether he settles their case. They are in no position to prevent class counsel from pursuing his own interests at their expense.[4] The named plaintiffs, those who actually have some chance of directing their lawyers, typically get amounts of cash without much relation to their individual damages, so their incentives align more with class counsel than with their fellow class members.
*830 Defendant and class counsel, in any class action, have incentives to collude in an agreement to bar victims’ claims for little or no compensation to the victims, in exchange for a big enough attorneys’ fee to induce betrayal of the interests of the purported “clients.” The defendant’s agreement not to oppose some amount for the fee creates the same incentive as a payment to a prizefighter to throw a fight. A real client may refuse a settlement that is bad for him but benefits his lawyer, but a large class of unknown individuals lacks the knowledge or authority to say no. It is hard to imagine a real client saying to his lawyer, “I have no objection to the defendant paying you a lot of money in exchange for agreement to seek nothing for me.” “The absence of individual clients controlling the litigation for their own benefit creates opportunities for collusive arrangements in which defendants can pay the attorneys for the plaintiff class enough money to induce them to settle the class action for too little benefit to the class (or too much benefit to the attorneys, if the claim is weak but the risks to the defendants high).”[5]
Rule 23 protects against these risks much as the courts have traditionally protected against similar risks when attorneys represent children, estates of deceased persons, and unknown persons, by requiring judicial approval of settlements. Approval and review, though, are a weak substitute for real clients, because judges know little about the case beyond what the lawyers tell them. That works much better when the lawyers are on different sides than when they are on the same side. Judges also may face an incentive problem, where a heavy docket cannot easily withstand the additional weight of a huge lawsuit that does not settle. Objectors provide a critically valuable service of providing knowledge from a different point of view, but one that is too often not used effectively. Our review process is supposed to assure that settlement of a class action, despite the risk of perverse incentives, is “fair, reasonable, and adequate”[6] and that notice is given “in a reasonable manner”[7] so that those bound by the settlement have an opportunity to be heard.
In this case, the process has failed. The attorneys for the class have obtained a judgment for millions of dollars in fees. The defendant, Facebook, has obtained a judgment that bars claims by millions of people victimized by its conduct. So have the other companies involved in Beacon. The victims, on the other hand, have obtained nothing. Under the settlement, Facebook even preserved the right to do the same thing to them again.

1. The Settlement is Unfair, Unreasonable, and Inadequate.

The factors for evaluating class action settlements[8] are multifarious and indeter *831 mínate, but the cases have become less tolerant of settlements • not beneficial to class members. We used to be extremely deferential when district courts approved settlements, as in Hanlon v. Chrysler Corp.,[9] the 1998 case on which the majority relies. We have in the last few years become much less so, as in our recent decisions In re Bluetooth,[10] Nachshin v. AOL, LLC,[11] and Dennis v. Kellogg Co.[12] We still exercise deferential review for abuse of discretion, but do so in light of what we rejected in Bluetooth, Nachshin, and Dennis. Review for abuse of discretion has never meant that we will affirm whatever a district court does.[13]
An extremely important qualification even in Hanlon was a “higher standard of fairness”[14] when settlement is reached before a class is certified. In this case, not only was settlement reached before class certification, but the class certified for settlement purposes was far broader than the one sought when the case was filed. The Hanlon “higher standard of fairness” matters because of “the dangers of collusion between class counsel and the defendant.” [15] Bluetooth emphasizes the need for greater scrutiny of precertification settlement on behalf of a class.[16] “Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.” [17]
Collusion is far more likely before certification, and exponentially higher if the class is expanded as part of the settlement. Here is why. If a lawsuit is only on behalf of named plaintiffs, damages are limited to what they may properly receive, so if a case is reasonably defensible, a defendant may make a sound financial decision to defend. But if a vast class is certified, then even a meritless case may require a defendant to settle or bet all the money it has or can borrow for attorneys’ fees, because even a very small chance of a very large verdict is too much to risk. Plaintiffs’ counsel want certification, to make the damages enough to be worth the time and expense of the litigation. Defense counsel oppose it, to keep the risk down to a level where they can afford the risk of litigation. Because certification of a class may turn even a meritless plaintiffs case into a bet-the-company defendant’s case, defendants usually vigorously oppose class *832 certification, giving courts the benefit of adversarial presentations.
Once the parties agree to settle, and agree to certify a class, defendant’s interests are reversed. Plaintiffs’ counsel still have an interest in keeping a large class certified, because the larger the class, the higher the attorneys’ fees are likely to be. But if the defendant will get a bar against claims, almost always a term of any settlement, the more people whose claims are barred the better. The risk of having to pay out a huge amount of money gets converted, by class certification, into a certainty that vast numbers of people will be unable to sue the defendant. So when settling before class certification, and agreeing upon class certification as part of the settlement, both sides have the same incentive, to certify the class and make it as vast and all-encompassing as possible. It is a bonanza for the defendant if it can bar the claims not only of everyone in the class described in the complaint, but also of a much larger class on whose behalf more and different claims might have been asserted.
And that is just what happened here. The complaint claims wrongdoing against and damages to Facebook users during the few weeks of the opt-out period of “Beacon.” The settlement bars claims of all the users during that period and during the much longer opt-in period. When they settled, Facebook and class counsel shared the same interest, as broad a class certification as possible. Ideally, from both the point of view of both sides’ interests (attorneys’ fees for one side, protection from claims for the other) the class would include everyone in the world, and bar all claims of any kind from the beginning of time to the present day. They came about as close to that as they plausibly could.
Bluetooth emphasizes that “clear sailing” agreements on attorneys’ fees are important warning signs of collusion.[18] We have a version of a clear sailing agreement here: Facebook’s agreement not to oppose an attorneys’ fees claim of up to $3,166,667. If, as here, the defendant agrees not to oppose an attorneys’ fees claim, and defendants payout will be the same no matter how high the fee is, then both sides have an incentive to make the fee large enough to induce plaintiffs’ counsel to sacrifice class interests to plaintiffs’ attorneys’ interests. Bluetooth holds that caution is especially necessary when, as here, members of the class receive no money, but class counsel receive a great deal of it.[19] As the amount of the fee to which no objection will be made grows, especially if the fee will not affect the cost to the defendant, it makes economic sense (though not ethical sense) for plaintiffs’ counsel to throw the fight for the money.
Strikingly, the settlement here goes even further than coupon settlements, where class members get only discounts if they buy again from the defendant claimed to have wronged them before, while their purported lawyers get huge amounts of money. Here the Facebook users get nothing at all, not even coupons. Every nickel of the remainder of the $9,500,000 after class counsel’s cut, administrative costs, and incentive payments to the named plaintiffs, goes not to the victims, but to an entity partially controlled by Facebook and class counsel. The new entity, dressed to look good in old law *833 French with its “cy pres” award and “nonprofit” status, can spend the money to “educate” people about privacy on the internet, perhaps via some instructional videos on how to use all the privacy features available in Facebook.
Arguably, no harm would be done if all claims of wrongdoing to Facebook users from the Beacon program were frivolous. If their claims were worthless, then no wrong is done to them when those claims are barred and $9.5 million gets transferred to some lawyers they never met and a new entity not likely to benefit them. But that would denigrate the claims too far. There is reason to believe that Face-book needed the shield its $9.5 million bought. Facebook got customer complaints and bad publicity from the opt-out Beacon program. The class had colorable claims. Facebook had a good argument that it was not itself a “video tape service provider” under the federal statute entitling a customer to liquidated damages of $2,500 for disclosure of what videotape someone had rented from Blockbuster,[20] but still had a risk of some sort of vicarious, joint, or “civil conspiracy” liability.[21] If found liable, it was a deep pocket target for the punitive damages for which the statute expressly provides.[22] And at least one federal district court has taken an expansive view of who is a “video tape service provider” prohibited from making disclosures.[23] The facts alleged in the complaint stimulate a concern about the privacy of people’s purchases on the internet and the use of customer information by Facebook.
Tort law tends to evolve to make actionable conduct widely seen as harmful, especially when the conduct is willful, as it was here. The plaintiffs’ claims and the risk of that evolution of tort law were worth money to avoid, for Facebook. We cannot reasonably say that a risk worth $9.5 million to Facebook to avoid nevertheless had no value whatsoever to the potential claimants whose claims presented that risk. If Facebook users had no colorable claims, why would Facebook have paid $9.5 million to bar them?

2. The Settlement does not Meet our Standards for Cy Pres Awards.

Even if the $9.5 million number, the attorneys’ fees, and the absence of • any relief whatsoever to class members all were “fair, reasonable and adequate,” the new foundation would still not satisfy the standards for cy pres awards. We held in Dennis v. Kellogg Co.[24] quoting Staton v. Boeing Co.,[25] that - cy pres distributions present “a particular danger” that “incentives favoring pursuit of self-interest rather than the class’s interests in fact influenced the outcome of negotiations.”[26]
Cy pres traditionally was a means by which, say, a bequest to a charity no longer existing when a testator died might be given instead to a similar charity doing similar work. Thus a bequest to the Boys’ *834 Club might go to its replacement, the Boys’ and Girls’ Club. The doctrine has never meant simply that money for harm to someone would be given to someone else preferred by the defendant and plaintiffs attorney and perhaps by the court. We cautioned in Nachshin v. AOL that “When selection of cy pres beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court.”[27]
The rules of judicial ethics have in many forms for over a hundred years prohibited judges from endorsing charities, because of the risk that lawyers and litigants will feel compelled to contribute to them.[28] Too liberal an approach to cy pres means that a court may simply order, and not merely encourage, someone subject to its jurisdiction to give to a preferred charity. A defendant may prefer a cy pres award to a damages award, for the public relations benefit. And the larger the cy pres award, the easier it is to justify a larger attorneys’ fees award. The incentive for collusion may be even greater where, as here, there is nothing to stop Facebook and class counsel from managing the charity to serve their interests and pay salaries and consulting fees to persons they choose.
Nachshin holds that the district court must ensure that a cy pres award targets the plaintiff class.[29] Here it does not. Six Mexican Workers v. Arizona Citrus Growers[30] holds that a district court must reject awards that provide “no reasonable certainty that any member will be benefit-ted.”[31] This one does not. We require an established record of performance by the charity of acts beneficial to people in the wronged class.[32] The cy pres award in this case goes to a new entity with no past performance at all. For all we know it will fund nothing but an “educational program” amounting to an advertising campaign for Facebook. That would appear to satisfy the articles and bylaws, and Facebook, after all, together with class counsel and their nominees, will run it.

3. Notice.

We review adequacy of notice de novo, not deferentially.[33] This is because notice is a matter of due process of law.[34] If a person owns a claim, it is property, and the owner of the claim is constitutionally entitled not to have it taken from him except with reasonable notice and an opportunity to be heard. Notice in this case was inadequate, most obviously because the class was not sufficiently informed that Facebook itself might be in control of the *835 money purportedly awarded on account of wrongs it committed against class members. The articles of incorporation and bylaws of the purportedly charitable foundation were posted online for the class to see only a week before the deadline to opt out of the settlement. Those documents said that “Tim Sparapani” would be on the three-person board, but failed to mention who he was, Facebook’s own Director of Public Policy. Nor did the notice say that Facebook’s counsel, Michael Rhodes, would sit on the foundation’s legal advisory board. Class members would have had to look carefully at the settlement agreement and figure out that Mr. Rhodes, the man designated as a legal advisor on page twelve of the settlement agreement, was the same man listed as Facebook’s attorney on page five. Class members dependant on the notice would have no idea that the money supposedly paid for wrongs to them was to be spent by agents of the purported wrongdoer.
Conclusion
The majority approves ratification of a class action settlement in which class members get no compensation at all. They do not get one cent. They do not get even an injunction against Facebook doing exactly the same thing to them again. Their purported lawyers get millions of dollars. Facebook gets a bar against any claims any of them might make for breach of their privacy rights. The most we could say for the cy pres award is that in exchange for giving up any claims they may have, the exposed Facebook users get the satisfaction of contributing to a charity to be funded by Facebook, partially controlled by Facebook, and advised by a legal team consisting of Facebook’s counsel and their own purported counsel whom they did not hire and have never met. Facebook deprived its users of their privacy. And now they are deprived of a remedy.

. 18 U.S.C. § 2710(b)(1), (c)(1) — (2) ("A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable.... Any person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court. The court may award — (A) actual damages but not less than liquidated damage in an amount of *829 $2500; (B) punitive damages; (C) reasonable attorneys’ fees and other litigation costs reasonably incurred; and (D) such other preliminary and equitable relief as the court determines to be appropriate.”).

.Fed.R.Civ.P. 23.

. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.1997)).

. See, e.g., Staton v. Boeing Co., 327 F.3d 938, 959-60 (9th Cir.2003).

. Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1327 (9th Cir.1999).

. Fed.R.Civ.P. 23(e)(2).

. Fed.R.Civ.P. 23(e)(1).

. See, e.g., Hanlon v. Chrysler Coip., 150 F.3d 1011, 1026 (9th Cir.1998) ("Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs’ case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.”) (citation omitted); Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688 F.2d 615, 625 (9th Cir.1982) (noting that such factors are "by no means an exhaustive list of relevant considerations.... The relative degree of importance to be attached to any particular factor will depend upon and *831 be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.”).

. Hanlon, 150 F.3d 1011.

. In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 946 (9th Cir.2011).

. Nachshin v. AOL, LLC, 663 F.3d 1034, 1040 (9th Cir.2011).

. Dennis v. Kellogg Co., No. 11-55674, 2012 WL 2870128 (9th Cir. July 13, 2012).

. Cf. Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1307-09 (9th Cir.1990) (finding that a district court's use of cy pres to distribute unclaimed settlement funds was an abuse of discretion because it did not "adequately target the plaintiff class and fail[ed] to provide adequate supervision over distribution”).

. Hanlon, 150 F.3d at 1026; see also Molski v. Gleich, 318 F.3d 937, 953 (9th Cir.2003), overruled on other grounds by Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571 (9th Cir.2010).

. Hanlon, 150 F.3d at 1026.

. In re Bluetooth, 654 F.3d 935, 946-47 (9th Cir.2011).

. Id. at 947.

. In re Bluetooth, 654 F.3d at 947 ("[A] 'clear sailing’ arrangement providing for the payment of attorneys’ fees separate and apart from class funds ... carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class.”) (citation and quotation omitted).

. Id. at 947.

. 18 U.S.C. § 2710(a)(4), (c)(2).

. In their complaint, Plaintiffs claimed that Facebook was engaged in a civil conspiracy to violate the Video Privacy Protection Act. See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454, 457 (1994) (giving an overview of the California law of civil conspiracy).

. 18 U.S.C. § 2710(c)(2)(B).

. Amazon.com LLC v. Lay, 758 F.Supp.2d 1154, 1167 (W.D.Wash.2010). ■

. Dennis v. Kellogg Co., No. 11-55674, 2012 WL 2870128 (9th Cir. July 13, 2012).

. Staton v. Boeing Co., 327 F.3d 938 (9th Cir.2003).

. Dennis v. Kellogg Co., 2012 WL 2870128, at *6.

. Nachshin v. AOL, LLC, 663 F.3d 1034, 1039 (9th Cir.2011).

. Canon 25 of the Canons of Judicial Ethics, first adopted by the ABA in 1924, states that a judge "should not solicit for charities, nor should he enter into any business relation which ... might bring his personal interest into conflict with the impartial performance of his official duties.” Henry S. Drinker, Legal Ethics 274, 333 (1965). The current ABA Model Rules have similar language. Model Code of Judicial Conduct R. 3.7 (2007). Something akin to this was an issue in Nachshin, where the judge’s husband sat on the board of a legal aid foundation that was to receive a donation as part of the settlement. Nachshin, 663 F.3d at 1041.

. Nachshin, 663 F.3d at 1039-40.

. Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301 (9th Cir.1990).

. Id. at 1308.

. Id.

. Silber v. Mabon, 18 F.3d 1449, 1453 (9th Cir. 1994).

. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1024 (9th Cir.1998).