**NEN THIO, Tju Tjin Liem and Denny Wijaya, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**GENJI, LLC, Genji Retail Support, Inc., Genji, Inc. and Doe 1 through and including Doe 10, Defendants.**

Case No. 12–cv–05756 NC

United States District Court,
N.D. California,
San Francisco Division

Signed August 7, 2014

Alan Dale Harris, Harris & Ruble, Los Angeles, CA, Abigail Ameri Zelenski, Jaurigue Law Group, Glendale, CA, David S. Harris, North Bay Law Group, Mill Valley, CA, for Plaintiffs.

Marlene S. Muraco, Elisa Nadeau, Littler Mendelson, PC, San Jose, CA, for Defendants.

Re: Dkt. No. 37

## ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT

Nathanael M. Cousins, United States Magistrate Judge

Plaintiffs move for preliminary approval of the settlement of this putative class action and collective action. Because plaintiffs have made a sufficient showing for the purposes of preliminary approval, the Court grants their motion. The Court also conditionally certifies a class action and a collective action for purposes of the settlement and approves the proposed notice to the class.

## I. BACKGROUND

### A. Plaintiffs' Allegations

Plaintiffs Nen Thio, Tju Tjin Liem, and Denny Wijaya are individuals who were employed by defendants Genji, Inc., Genji Retail Support, Inc., and/or Genji LLC (collectively, "Genji"). Dkt. No. 5–1 ¶ 1. Genji is a retail provider of sushi and Japanese cuisine. *Id.* ¶ 5. Genji sells its sushi and Japanese cuisine through supermarket sushi bars at Whole Foods Markets in the State of California and elsewhere throughout the country. *Id.* At the Whole Foods stores, Genji employs Sushi Chefs which are referred to by Genji as Sushi Team Members. *Id.* ¶ 15; Dkt. No. 38 ¶ 3. One of the Sushi Chefs also works in the capacity of an in-store "manager," also referred to as Sushi Team Leader or Store Team Leader. Dkt. Nos. 5–1 ¶¶ 6, 10; 38 ¶¶ 4–6. The Sushi Team Leader has some minimal managerial responsibilities and was historically paid a salary rather than hourly wage. *Id.*

Plaintiff Nen Thio worked for Genji from May 2010 through March 2012. Dkt. No. 5–1 ¶ 6. As a Genji employee, Thio worked as both a Sushi Chef and a Sushi Team Leader at various Whole Foods Markets throughout the San Francisco Bay Area, preparing and selling sushi and other Japanese cuisine. *Id.* In addition to making sushi for sale, Thio and his fellow employees would cook and clean their designated area within the store. *Id.* ¶ 7. In his capacity as a Sushi Chef, Thio worked approximately 40 to 55 hours per week. *Id.* ¶ 8. In his capacity as a Sushi Team Leader, Thio worked 50 or more

hours per week. *Id.* During his tenure as a Sushi Chef, Thio was paid an hourly wage ranging between $11.25 and $12.75 per hour and was paid overtime wages in those instances when he worked more than 8 hours in a day or 40 hours in a work week. *Id.* In August 2010, Thio was promoted from a Sushi Chef to a Sushi Team Leader. *Id.* In his capacity as a Sushi Team Leader, Thio was paid flat biweekly wages of $1,423.08, regardless of the number of hours he worked in a given day and/or week. *Id.* As a Sushi Team Leader, Thio was not paid overtime wages regardless of the number of hours he worked, nor was he provided with any 10–minute rest breaks or 30–minute unpaid meal breaks. *Id.*; Dkt. No. 38 ¶ 4.

Plaintiff Tju Tjin Liem worked for Genji from July 2009 through August 2012. Dkt. No. 5–1 ¶ 10. At Genji, Liem worked as both a Sushi Chef and a Sushi Team Leader. *Id.* In her capacity as a Sushi Chef, she worked at Whole Foods Markets in Sarasota, Florida. *Id.* In the summer of 2010, Liem was promoted to Sushi Team Leader of the Sarasota store. *Id.* Shortly thereafter, Liem was approached to transfer to northern California in order to assist Genji in opening up a number of new stores in California. *Id.* In September 2010, Liem moved to California, where she worked for eight different Whole Foods Markets. *Id.* In her capacity as a Sushi Team Leader, Liem worked approximately 50 or more hours per week but she was paid flat biweekly wages regardless of the number of hours she worked in a given day and/or week. *Id.* ¶ 12. As a Sushi Team Leader, Liem was not paid overtime wages regardless of the number of hours she worked, nor was she provided with meal and rest breaks. *Id.*; Dkt. No. 38 ¶ 5.

In their capacity as Sushi Team Leaders, Thio and Liem were responsible for largely the same tasks as their fellow Sushi Chefs. Dkt. No. 5–1 ¶¶ 7, 11. As Sushi Team Leaders, Thio and Liem were responsible for the additional tasks of ordering on a weekly basis fish, vegetables and various supplies for the store in which they worked, conducting monthly inventory, and preparing and posting the weekly schedule which was reviewed and approved by the District Manager. Dkt. No. 38 ¶¶ 4–5. As Sushi Team Leaders, Thio and Liem, however, did not do any other managing, disciplining, interviewing, hiring, firing or any other tasks that fall within the exemptions set forth under the applicable Wage Order. Dkt. No. 5–1 ¶¶ 7, 11; *see also* Dkt. Nos. 41–5, 41–6.

Plaintiff Denny Wijaya worked for Genji from November 2010 through August 2012. Dkt. No. 5–1 ¶ 13. Throughout the tenure of his employment, Wijaya worked as a Sushi Chef at the Whole Foods Market in San Jose, California. *Id.* As a Sushi Chef, Wijaya's job responsibilities included making sushi, cooking and cleaning. Wijaya worked approximately 40 to 50 or more hours per week. *Id.*; *see also* Dkt. No. 41–7.

## B. Procedural History

Plaintiffs commenced this action on November 9, 2012. Dkt. No. 1. In the operative First Amended Complaint, plaintiffs assert causes of action for: (1) failure to pay minimum wage and overtime compensation under California Labor Code §§ 510 and 1194; (2) failure to provide accurate itemized wage statements under California Labor Code § 226; (3) failure to pay minimum wage and overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b); (4) failure to provide adequate rest periods under California Labor Code § 226.7, and IWC Wage Order 8; (5) failure to provide adequate meal periods under California Labor

Code §§ 226.7, 512 and IWC Wage Order 8; (6) continuing wages under California Labor Code § 203; (7) breach of contract arising out of failure to pay bonuses; (8) restitution and injunctive relief under California Business and Professions Code § 17200 *et seq.*; (9) wrongful termination in violation of public policy by plaintiff Wijaya only; (10) for discrimination, harassment, wrongful termination in violation of California Fair Employment and Housing Act, California Government Code § 12940 *et seq.* by plaintiff Wijaya only; and (11) for civil penalties under the Private Attorneys General Act ("PAGA"), California Labor Code § 2698. Dkt. No. 5–1.

Plaintiffs brought this case as a "California, statewide class action on behalf of all individuals who, at any time during the four years preceding the filing of the original Complaint, through the date of the filing of a motion for class certification, were or have been employed by Genji, Inc., Genji Retail Support, Inc. and/or Genji LLC in California." *Id.* ¶¶ 20, 46. The case was also brought as a collective action under the FLSA on behalf of "all individuals who, at any time during the three years preceding the filing of this Complaint, were or have been employed as Sushi Team Leaders by Defendants Genji Retail Support, Inc. and/or Genji LLC in the United States." *Id.* ¶¶ 20, 66.

The parties engaged in discovery involving the exchange of over 6500 documents and additional payroll data. Dkt. No. 38 ¶ 40. As part of the discovery exchange, Genji provided the timecard data for 90 randomly selected putative class/collective action members, including the time records for 37 California Sushi Chefs, 20 California Sushi Team Leaders and 33 non-California Sushi Team Leaders. Dkt. No. 41–3 ¶ 6. Plaintiffs' counsel represent that they conducted a thorough investigation into the facts of this case including by interviewing class members, reviewing hundreds of pages of relevant documents such as policy documents, researching the applicable law and potential defenses, and reviewing payroll data and time records for what counsel's expert indicated was a significant random sample of the class members. *Id.* ¶ 8.

On July 10, 2013, the parties participated in a full-day mediation session facilitated by Jeffrey Ross, a mediator experienced in wage and hour class actions. Dkt. Nos. 38 ¶ 42; 41–3 ¶ 7. As a result of the mediation, the parties entered into a settlement resolving the entire case. Dkt. Nos. 27; 38 ¶¶ 16, 42–43.

In November 2013, plaintiffs filed an unopposed motion seeking a preliminary approval of the settlement. Dkt. No. 37. The Court held a hearing at which no objectors appeared.

## C. Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because plaintiffs seek relief for violations of the FLSA, 29 U.S.C. § 203. *See* Dkt. No. 5–1 ¶¶ 2, 84–87. The Court has supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367. All parties consented to the jurisdiction of a United States Magistrate Judge under 28 U.S.C. § 636(c). Dkt. Nos. 15, 16.

## D. Overview of the Settlement Agreement

The settlement agreement requires Genji to pay up to $1,250,000 in cash ("total settlement amount"). Dkt. Nos. 41–3 ¶ 18; 38 ¶ 17. For purposes of the settlement, plaintiffs have proposed three subclasses which will receive distribution of $1,100,000 to be paid by Genji to settle the claims of the Rule 23 Class ("California

payment"). Dkt. Nos. 41–3 ¶¶ 16, 28; 38 ¶ 17. In addition, up to $150,000 will be distributed to individuals who choose to opt in to a FLSA collective action ("FLSA payment"). Dkt. No. 41–3 ¶ 17. The following is a summary of the proposed structure for the overall distribution of the total settlement amount:

- Total settlement amount $1,250,000
- Attorneys' fees (not to exceed) $375,000
- Attorneys' costs (not to exceed) $20,000
- Plaintiffs' incentive awards (not to exceed) $15,000
- Costs of claims administration (not to exceed) $18,000
- PAGA payment $10,000
- Net settlement amount $812,000
- FLSA possible payments $150,000
- Section 203 subclass $40,000
- Sushi Team Leader subclass $311,000
- All Employees (Sushi Chef/Sushi Team Leader) subclass $311,000

Dkt. No. 38 ¶ 17.

The key provisions of the settlement agreement are summarized in more detail below.

### 1. Class Definition

For purposes of the settlement, plaintiffs request that the Court certify a class under Federal Rule of Civil Procedure 23 comprising of "[a]ll individuals employed within California as a Sushi Team Leader or Sushi Chef at any time from November 9, 2008 through the date of Preliminary Approval." Dkt. No. 41–3 ¶ 11. Additionally, plaintiffs request for settlement purposes that the Court certify a collective action pursuant to Section 216(b) of the FLSA comprising of "[a]ll individuals employed within the United States as a Sushi Team Leader at any time from November 9, 2010 through the date of Preliminary Approval." Id. ¶ 12.

Plaintiffs further request that Thio, Liem, and Wijaya be appointed as class representatives for the Rule 23 class and that Thio and Liem be appointed as class representatives for the collective action class. Id. ¶ 13.

Plaintiffs request that Alan Harris and Priya Mohan, Harris & Ruble, and David S. Harris, North Bay Law Group, be appointed as class counsel for the settlement classes. Dkt. No. 41–3 ¶ 14.

### 2. Payment to the Settlement Class

The $1,250,000 total settlement amount consists of two separate funds: the California payment and the FLSA payment. The total settlement amount will be used to pay: (1) attorneys' fees and costs of class counsel; (2) costs of settlement administration; (3) incentive payments to the class representatives; and (4) the PAGA payment, all subject to approval by the Court. Dkt. No. 41–3 ¶ 20.

#### a. Proposed Distribution of the California Payment

The $1,100,000 California payment is to be shared by three separate subclasses: (1) California Sushi Team Leaders, (2) all California employees (both California Sushi Team Leaders and California Sushi Chefs), and (3) all former California employees.

The settlement agreement provides that $40,000 of the California payment will be used to create the "203 Fund," which will be split evenly among the Rule 23 claimants whose employment terminated prior to the date of preliminary approval of the settlement. Dkt. No. 41–3 ¶ 28(b).

The balance of the California payment remaining after deduction of the 203 Fund

will be split evenly into two funds—the "California STL Fund" and the "California Employee Fund." *Id.* ¶ 28(c). The settlement agreement further provides that the California STL Fund will be allocated pro-rata based upon the number of hours of overtime worked between the dates of November 9, 2008, and January 7, 2013. *Id.* ¶ 28(d). The California Employee Fund will be allocated pro-rata based upon the number of days worked for Genji in a California store between the dates of November 9, 2008, and the date of preliminary approval. *Id.* ¶ 28(e). Each Rule 23 claimant will be entitled to receive a payment from any of the three funds for which he or she qualifies. *Id.* ¶ 28(f).

If less than one hundred percent of the California payment is claimed by Rule 23 claimants, the sum remaining will be used to pay Genji's portion of the payroll taxes owed on the payments made to the Rule 23 claimants. *Id.* ¶ 28(h). If any portion of the California payment remains after deduction of Genji's payroll taxes, the parties are to instruct the claims administrator to increase the amount to be distributed to the Rule 23 claimants on a pro rata basis so that one hundred percent of the California payment is distributed. *Id.* ¶ 28(i).

Thus, after payment of Genji's payroll taxes, all of the $1,100,000 California payment will be distributed to class members. *Id.* ¶ 16. According to the settlement agreement, any funds remaining with the claims administrator due to the failure of class members to negotiate their checks will be distributed to the State of California Labor and Workforce Development Agency ("LWDA") as the cy pres recipient. *Id.* ¶ 60; Dkt. No. 38 ¶ 48.

### b. Proposed Distribution of the FLSA Payment

The settlement agreement further provides that the $150,000 FLSA payment will be allocated pro-rata among the collective action claimants based upon the number of hours of overtime worked as a Sushi Team Leader between the dates of November 9, 2010 and October 27, 2013, as compared to the total number of hours of overtime worked by the members of the proposed class during that time period. Dkt. No. 41–3 ¶ 29(a). Any unclaimed portion of the FLSA payment will remain with Genji and will not be disbursed as part of the settlement. *Id.* ¶ 17.

### 3. Incentive Awards and Attorneys' Fees and Costs

Under the terms of the settlement agreement, class counsel will apply for incentive awards to plaintiffs of $5,000, each, for their efforts in this case, which will be in addition to any payment plaintiffs may otherwise receive as class members. Dkt. No. 41–3 ¶ 25. In addition, the settlement provides that class counsel will apply to the Court for an award of attorneys' fees and costs, which will be scheduled for determination at the final fairness and approval hearing. *Id.* ¶ 22. Genji has agreed to not oppose an application by class counsel for a fee which does not exceed 30% of the total settlement amount less any amount not claimed by FLSA collective action claimants. *Id.* The requested incentive awards and attorneys' fees and costs will be subject to Court approval. *Id.* If lesser amounts are awarded, the difference will be included in the net settlement fund. *Id.* ¶ 20.

### 4. Injunctive Relief

Plaintiffs represent that the settlement contains "implicit injunctive relief" in that this suit seems to have been the catalyst for Genji's action reclassifying all its California Sushi Team Leaders from exempt to non-exempt status on January 7, 2013. Dkt. No. 38 ¶¶ 21, 45. As a result, beginning in January 2013, Genji began paying

California Sushi Team Leaders for all hours worked, which includes the payment of overtime wages. *Id.* ¶ 21. Similarly, since early October 2013, non-California Sushi Team Leaders have been paid overtime by Genji. *Id.* The additional costs of paying overtime to Sushi Team Leaders, as implemented during 2013, are not charged against the settlement funds. *Id.*

### 5. Release of Claims

The settlement agreement provides that Rule 23 class members who fail to submit a timely exclusion form release "any and all claims, from November 9, 2008 through the date of the Preliminary Approval Order, against Released Parties that were raised or that could have been raised under California law based upon the facts set forth in the First Amended Complaint." Dkt. No. 41–3 ¶¶ 61–62.

Further, under the settlement agreement, all individuals in the proposed collective action class who timely file a claim form and thereby opt in to the settlement release "any and all claims, from November 9, 2010 through the date of the Preliminary Approval Order, against Released Parties that were raised or that could have been raised under the Fair Labor Standards Act based upon the facts set forth in the First Amended Complaint." *Id.* ¶¶ 64–65.

### 6. Class Notice

The settlement agreement calls for the appointment of a claims administrator to deliver the class notice and claim form to the class. Dkt. No. 41–3 ¶¶ 32–33. Within 20 calendar days after preliminary approval is granted, Genji will provide to the claims administrator a database with the class members' name, Social Security Number, last known address, and telephone number, as well as the payroll information necessary to determine each individual's estimated settlement payment. *Id.* ¶¶ 32, 34.

The settlement agreement provides that, within 30 calendar days after the claims administrator receives that database, the claims administrator will mail to all class members, via First Class United States Mail, postage prepaid, a copy of the Court approved class notice, claim form, and (for the proposed members of the Rule 23 class only) exclusion form. *Id.* ¶ 33. The settlement agreement further provides that the claims administrator will use standard devices, including the National Change of Address database or equivalent, to obtain forwarding addresses prior to mailing and will use appropriate skip tracing to take appropriate steps to maximize the probability that the notice and other materials will be received by all class members. *Id.* ¶ 35.

The settlement agreement provides that, in order for a class member to be eligible to participate in the settlement and to receive any settlement payments, the class member must submit a valid, fully executed claim form (along with all required documentation) to the claims administrator, postmarked no later than 45 calendar days after the initial date of mailing of the class notice and claim form. *Id.* ¶ 40. The class members will have 45 calendar days after the date on which the claims administrator mails the notice to object to the settlement by serving on the claims administrator a written objection to the settlement. *Id.* ¶ 42.

In order for a Rule 23 class member to request exclusion from the settlement, he or she must submit to the claims administrator an exclusion form, postmarked no later than 45 calendar days after the date of mailing of the class notice, claim form and exclusion form. *Id.* ¶ 46. Any Rule 23 class member who does not properly and timely submit an exclusion form will

be bound by all terms and conditions of the settlement, including its release of claims, if the settlement is approved by the Court, regardless of whether he or she has objected to the settlement or submitted a completed claim form. *Id.* ¶ 47.

## III. DISCUSSION

### A. Preliminary Approval of the Settlement

Federal Rule of Civil Procedure 23(e) requires judicial approval of any settlement by a certified class. Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1238 (9th Cir.1998), "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights," *In re Syncor ERISA Litig.,* 516 F.3d 1095, 1100 (9th Cir.2008). Accordingly, a settlement should only be approved if it is "fundamentally fair, adequate, and reasonable." *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.1993) (internal quotation marks omitted). In determining whether the proposed settlement meets this standard, the Court does not have the ability "to delete, modify, or substitute certain provisions .... The settlement must stand or fall in its entirety." *Id.* Due to the dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative, settlement approval that takes place prior to formal class certification requires a higher standard of fairness. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998).

"The Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." *Harris v. Vector Mktg. Corp.,* No. 08–cv–05198 EMC, 2011 WL 1627973, at *7 (N.D.Cal. Apr. 29, 2011); *In re Tableware Antitrust Litig.,* 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007).

Additionally, settlements of collective action claims under the FLSA also require court approval. *Jones v. Agilysys, Inc.,* No. 12–cv–03516 SBA, 2013 WL 4426504, at *2 (N.D.Cal. Aug. 15, 2013). "The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk,* —— U.S. ——, 133 S.Ct. 1523, 1527, 185 L.Ed.2d 636 (2013). Because an employee's claims under the FLSA are non-waivable, they may not be settled without supervision of either the Secretary of Labor or a district court. *Yue Zhou v. Wang's Restaurant,* No. 05–cv–0279 PVT, 2007 WL 2298046, *1 (N.D.Cal. Aug. 8, 2007) (citing *Barrentine v. Ark.–Best Freight Sys., Inc.,* 450 U.S. 728, 740, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352–53 (11th Cir. 1982)). A district court presented with a proposed settlement of FLSA claims "must determine whether the settlement is a fair and reasonable resolution of a *bona fide* dispute.... 'If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute[,] ... the district court [may] approve the settlement in order to promote the policy of encouraging settlement of litigation." *Id.* (quoting *Lynn's Food Stores,* 679 F.2d at 1355); *see also*

*McKeen–Chaplin v. Franklin Am. Mortg. Co.,* No. 10–cv–5243 SBA, 2012 WL 6629608, *2 (N.D.Cal. Dec. 19, 2012).

The Court reviews the preliminary approval factors in turn.

### 1. The Settlement Process

█ The Court first considers the means by which the parties reached their settlement. Here, the settlement was reached after counsel conducted extensive investigation and discovery into the facts of this case, which included the review of policy documents, payroll data and time records. Settlement negotiations occurred at arm's length with the assistance of a mediator experienced in wage and hour class actions. The settlement thus appears to be the product of serious, informed, non-collusive negotiations. Accordingly, the process by which the parties reached their settlement weighs in favor of preliminary approval.

### 2. The Presence of Obvious Deficiencies

The Court must next analyze whether there are obvious deficiencies in the settlement agreement. Having reviewed the motion for preliminary approval and supporting materials, and considered the arguments of counsel at the hearing, the Court finds no obvious deficiencies in the settlement agreement.

The Court notes that, while the scope of the release in the proposed settlement is broad, it is acceptable because the claims released are limited to those based upon the facts set forth in the First Amended Complaint. *See Hesse v. Sprint Corp.,* 598 F.3d 581, 590 (9th Cir.2010) ("A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action.") (internal quotation marks and citations omitted); *Custom LED, LLC v. eBay, Inc,* No. 12–cv–00350 JST, 2013 WL 6114379, at *4, *7 (N.D.Cal. Nov. 20, 2013) (scope of release in class action settlement was not improperly broad where it released all claims, "known or unknown," "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action, or any legal theories that could have been raised based on the allegations of the Action."); *Collins v. Cargill Meat Solutions Corp.,* 274 F.R.D. 294, 303 (E.D.Cal.2011) (granting preliminary approval of class action settlement where released claims were "based on the facts alleged" in the complaint and thus appropriately tracked the breadth of plaintiffs' allegations in the action and the settlement did not release "unrelated claims").

Accordingly, the lack of obvious deficiencies also weighs in favor of granting preliminary approval of the proposed settlement.

### 3. Preferential Treatment

The third factor the Court considers is whether the settlement agreement provides preferential treatment to any class member.

According to the settlement agreement here, the FLSA payment will be allocated pro rata among the collective action claimants based upon the number of hours of overtime worked. Further, each Rule 23 claimant will be entitled to receive a payment from any of the three funds for which he or she qualifies. Of those funds, the 203 Fund will be split evenly among former employees, the California STL Fund will be allocated pro rata among the overtime class based upon the number of

hours of overtime worked, and the California Employee Fund will be allocated pro rata among the meal and rest break class based upon the number of days worked. The proposed distribution of the settlement funds does not appear to grant undue preferential treatment to any class members.

While the settlement agreement authorizes class counsel to apply for incentive awards to plaintiffs of $5,000, these incentive awards, should the Court finally approve them, do not render the settlement unfair, since "the Ninth Circuit has recognized that service awards to named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable." *Harris*, 2011 WL 1627973, at *9 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir.2003)). The Court finds no indication of unfair treatment to certain members of the class, and therefore this factor supports preliminary approval.

### 4. Whether the Settlement Falls Within the Range of Possible Approval

 Finally, the Court must determine whether the proposed settlement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiff's expected recovery balanced against the value of the settlement offer." *Harris*, 2011 WL 1627973, at *9 (quoting *Vasquez v. Coast Valley Roofing, Inc.*, 670 F.Supp.2d 1114, 1125 (E.D.Cal. 2009)). To determine whether an agreement is fundamentally fair, adequate, and reasonable, the Court may preview the factors that ultimately inform final approval: "[1] the strength of plaintiff's case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status through-

out the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Id.* at *9 (citing *Churchill Village v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). As part of this assessment, the Court must "compare the value of the settlement against the expected recovery at trial" by estimating "the maximum amount of damages recoverable in a successful litigation and compare that with the settlement amount." *Id.* at *11 (internal quotation marks omitted). The Court will address first the value of the settlement.

### a. The Value of the Payment to the Rule 23 Class

Plaintiffs represent that, according to defendants' records, the California payment will be shared by approximately 420 class members, including some 216 former employees. If the Court awards all requested fees and costs, the California subclasses will split at least $662,000.

### i. Sushi Team Leader Subclass

This subclass addresses plaintiffs' contention that Genji failed to pay overtime wages to California Sushi Team Leaders in violation of California law. Under California law, "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek ... shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee," and "[a]ny work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee." Cal. Lab. Code § 510(a). Plaintiffs allege that the magnitude of the short payments to class members, includ-

ing the Sushi Team Leaders, may be readily computed as they were required to use time clocks to record their attendance at work. Dkt. No. 5–1 at 14. Based on the recorded total number of overtime worked and an average hourly rate, plaintiffs calculate the maximum recovery as approximately $408,262 in overtime wages. Dkt. No. 38 ¶ 18. Plaintiffs estimate that, assuming a 50% participation rate, the California Sushi Team Leaders' overtime claims will be paid in full by the $311,000 fund. *Id.*

#### ii. All California Employees Subclass

This subclass addresses plaintiffs' contention that Genji failed to pay California employees (Sushi Team Leaders and Sushi Chefs) appropriate wages on account of missed meal periods and rest breaks. Under the California Labor Code, "[i]f an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the [IWC], the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period [wa]s not provided." Cal. Lab. Code § 226.7(b) (2000).

Plaintiffs represent that, while the employee handbook provides that the workers may take meal breaks after 4 hours of work, and the information obtained from Genji reveals that compliant breaks were frequently taken by the Sushi Chefs, the work rules made no provision whatsoever for rest breaks. Dkt. No. 38 ¶¶ 22. According to the information provided by Genji, plaintiffs estimate that this subclass worked for a total of approximately 100,000 days during the relevant time period, with the Sushi Chefs accounting for the majority of that time. *Id.* ¶¶ 22, 35. By multiplying the total number of days worked by the approximate weighted hourly rate for the Sushi Team Leaders and

Sushi Chefs, plaintiffs calculate that the total rest break damages would be approximately $1,259,000. *Id.* Plaintiffs estimate that, assuming a 50% participation rate, the projected $311,000 fund would pay for about half of the maximum recovery, with each day having a "value" of about $6.22. *Id.* Accordingly, one who worked for a two hundred days in a year would receive a payment of about $1,244 (200 days × $6.22 = $1,244) and an employee who worked throughout the entire class period could receive a payment approaching $6,000. *Id.*

#### iii. Derivative Claims

Plaintiffs' First Amended Complaint also asserts three derivative class-wide claims stemming from Genji's alleged failure to pay proper overtime and provide proper breaks to California employees. First, plaintiffs assert a derivative penalty claim for continuing wages under sections 201 through 203 of the California Labor Code. Plaintiffs contend that as continuing wages are treated as penalties, and very likely could have been discounted to zero, claims for § 203 penalties should be discounted so that each former employee who submits a claim will receive a modest payment. Dkt. No. 38 ¶¶ 79–80. Under the proposed settlement, those of the 216 former employees who submit claim forms will take an equal share of the $40,000 fund established to resolve claims under § 203. Plaintiffs estimate that, if every former California employee participates in the settlement, each will receive approximately $185 for California Labor Code § 203 penalties; if 50% of the former California employees submit claims, each will receive approximately $370 on account of Genji's failure to pay all wages at termination. Dkt. No. 38 ¶ 38.

In addition, plaintiffs assert a wage statement claim under § 226 of the California Labor Code (requiring employers to

provide their employees with "accurate itemized statement[s]" and imposing damages for a "knowing and intentional" violation of this requirement). Plaintiffs also bring a derivative claim seeking restitution of unpaid overtime and missed-breaks wages for themselves and all similarly situated employees under Business and Professions Code § 17200 *et seq.* simultaneously with their claims under the Labor Code. The settlement does not provide for a separate payment on account of the § 226 and § 17200 derivative claims. Class counsel argue that the potential claims for penalties under § 226 of the California Labor Code should be discounted entirely as other payments in the proposed distribution may be deemed to be a proxy for a small payment on account of this penalty. Dkt. No. 38 ¶ 80. Counsel submit that the derivative wage statement claim arguably does not give rise to cognizable damages. Dkt. No. 37 at 18–19. Counsel further assert that, since the defective wage statement violation and the violation arising from the failure to pay all wages when the employee was fired, laid off or quit are by their nature penalties, they are appropriately discounted enabling the California payments to be distributed on account of unpaid overtime wage, meal and rest break premiums. Dkt. No. 38 ¶¶ 79–80.

Finally, plaintiffs assert a PAGA civil penalties claim under § 2698 *et seq.* of the California Labor Code. PAGA permits "an aggrieved employee" to seek civil penalties "on behalf of himself or herself and other current or former employees" for violations of sections 201, 202, 226, 510, and 512 of the Labor Code, which penalties are to be split between the aggrieved employees and the LWDA. *See* Cal. Lab. Code § 2699(a), (i). Under the settlement, in satisfaction of the PAGA claim, the LWDA will receive a minimum payment of $10,000.

### b. The Value of the FLSA Payment

The FLSA provides that "no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a).

The proposed settlement of the FLSA collective action here allocates a settlement fund of up to $150,000 to 41 California Sushi Team Leaders and 189 non-California Sushi Team Leaders. Dkt. No. 38 ¶ 3. Plaintiffs estimate that, if all of the members of this class opt in, each individual would receive an average gross FLSA recovery of approximately $650 each. *Id.* Individuals who claim against the $150,000 fund will receive a gross recovery of approximately $1.50 per hour for recorded overtime services. *Id.*

### c. The Settlement Value Supports Preliminary Approval.

In summary, assuming a 50% participation rate, the $1,250,000 total settlement payment will provide all misclassified claimants employed by Genji in California with an estimated approximate payment in full of their unpaid overtime wages and about half of the maximum recovery payments for missed meal break and rest periods, and will provide a modest payment under § 203 of the California Labor Code to former California employees who submit claims. *See* Dkt. No. 38 ¶ 38. While the proposed class notice explains that the "California Employee Subclass" addresses plaintiffs' contract claim in addition to the meal and rest break claims, plaintiffs' motion for preliminary approval does not explain what part of the settlement amount is allocated to the contract claim or why the allocation is fair. *See*

Dkt. No. 41–1 at 4. Despite these concerns, the overall settlement appears to provide for a fair amount of recovery considering other class settlement awards receiving approval. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir.2000) (finding a recovery of one-sixth of the potential recovery to be fair under the circumstances); *Greko v. Diesel U.S.A., Inc.*, No. 10–cv–02576 NC, 2013 WL 1789602, at *5 (N.D.Cal. Apr. 26, 2013) (24 percent); *Glass v. UBS Fin. Serv., Inc.*, No. 06–cv–4068 MMC, 2007 WL 221862, at *4 (N.D.Cal. Jan. 26, 2007) (25 to 35 percent).

### d. The Remaining Factors Weigh in Favor of Preliminary Approval.

Turning to the other factors informing settlement approval, such as the strength of plaintiffs' case, the extent of discovery completed at this stage of the proceedings, the risk of maintaining class action status, and the risk, expense, and likely duration of the litigation, the Court finds that all weigh in favor of preliminary approval of the proposed settlement agreement. Plaintiffs assert that they faced a significant amount of uncertainty if they were to go forward with this litigation due to the disputed nature of the legal issues in this case, namely whether Genji improperly misclassified in-store "managers" as exempt under state and federal laws and systematically deprived its employees who worked at many different in-store locations with proper meal periods and rest breaks. Dkt. No. 38 ¶¶ 66–67. Furthermore, plaintiffs assert that securing certification of a statewide class with operations at several locations, in several different cities, is not a result which one could predict with certitude. *Id.* ¶ 68. Genji argued that proper meal and rest breaks were always provided to employees (and taken by them), and that any deviations from that practice were rare, so that a store by store analysis would be required to establish any liability and that class certification would be unlikely. *Id.* ¶ 32. Plaintiffs thus assert that the class recovery on account of missed meal and rest breaks is discounted due to the fact of the difficulty in achieving and maintaining certification of a meal and rest break class or classes. *Id.* ¶ 32. Furthermore, plaintiffs represent that the parties have conducted extensive discovery regarding each of the relevant issues in the case, and that class counsel consulted with an expert on certification and damages issues in this case. *Id.* ¶ 70. Thus, when class counsel negotiated the settlement, they had sufficient information to adequately assess the strengths and weaknesses of the case, aided by their experience in litigating wage and hour class actions. *Id.* ¶¶ 70–76. As to the reaction of the class, plaintiffs represent that, at this stage of the litigation, no "tag-along" cases have been filed, with "new" counsel questioning whether the settlement is sufficient. *Id.* ¶ 77.

Additionally, the settlement provides for some FLSA overtime payments to Sushi Team Leaders nationwide. This case involves disputed issues of FLSA coverage and potential liability, which constitutes a bona fide dispute. *See* Dkt. Nos. 5–1, 7. Although plaintiffs have provided limited information regarding the value of the settlement of the FLSA claim in light of the maximum recovery, at this preliminary review stage the settlement appears to reflect a fair and reasonable compromise and falls within the range of possible initial approval based on the strengths of plaintiffs' case and the risks and expense of continued litigation. At the final approval hearing, however, the parties must be prepared to present specific evidence that would allow the Court to assess the value of the settlement payments in light of the maximum recovery. *See Harris*, 2011 WL 1627973, at *13 (initially approving settle-

ment but noting "if the claims rate is low and the aggregate recovery paltry, the Court will likely refuse to [finally] approve the settlement.").

Because the balance of the factors considered by the Court weighs in favor of preliminary approval, plaintiffs' motion for preliminary approval of the settlement is granted.

## B. Conditional Certification of the Class and Collective Action

### 1. The Rule 23 Class

Class certification requires that: (1) the class be so numerous that joinder of all members individually is 'impracticable;' (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representative must be typical of the claims or defenses of the class; and (4) the person representing the class must be able fairly and adequately to protect the interests of all members of the class. Fed. R. Civ. P. 23(a); *Staton v. Boeing*, 327 F.3d 938, 953 (9th Cir.2003). In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Federal Rule of Civil Procedure 23(b). Here, the parties assert that the action is maintainable under Rule 23(b)(3) because questions of law or fact common to class members predominate over any question affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b); *Hanlon*, 150 F.3d at 1022.

 The proposed settlement class appears to meet the requirements for certification under Rule 23(a). First, there are 189 potential collective action members, 41 total class members in the California Sushi Team Leader subclass, and 380 total class members in the group of California Sushi Chefs. Dkt. No. 38 ¶ 11. The total number of potential class members is over 400 employees, of which 216 are former employees. *Id.* The potential class members are thus sufficiently numerous that joinder of all members would be impracticable. Second, there are questions of fact and law common to all class members, such as the legality of Genji's meal break policy and its lack of any written rest break policy, as well as whether Genji misclassified its Sushi Team Leaders as exempt nationwide. *See id.* ¶¶ 29, 66. Third, plaintiffs represent that the fact-pattern underlying plaintiffs' claims is similar, if not identical, to that for other class members. *See* Dkt. Nos. 37 at 27; 38 ¶¶ 4–6. Two of the plaintiffs were employed by Genji as Sushi Team Leaders, and two worked as Sushi Chefs in California. *Id.* Fourth, plaintiffs represent that there are no conflicts of interest between them and the class members, and there are no perceived conflicts with plaintiffs' counsel. *See* Dkt. Nos. 37 at 27; 38 ¶ 72; 41–5; 41–6; 41–7.

Further, the proposed class meets the requirements of Rule 23(b). Plaintiffs' challenges to the legality of Genji's meal break policy, the lack of any written rest break policy, and Genji's misclassification of its Sushi Team Leaders as exempt nationwide are subject to common resolution. These legal questions represent a significant aspect of the case, and based on the record before the Court, do not appear to be outweighed by any questions affecting only individual members. *See Hanlon*, 150 F.3d at 1022 ("When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice & Procedure* § 1778 (2d ed. 1986)).

Additionally, considerations of judicial economy favor litigating this case as a class action. Since this case involves multiple claims for relatively small sums, a class action is superior to an alternative method for adjudicating the parties' claims. *See Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir.2001) ("[I]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover."). According to the record provided, no potential class member has expressed a desire to proceed independently and no unusual obstacles have appeared that would make managing the class particularly difficult.

The Court finds that this action is maintainable under Federal Rule of Civil Procedure 23(a) and (b), and therefore, conditionally certifies the proposed classes for purposes of settlement.

## 2. The Collective Action

The Court next addresses whether it is appropriate to certify a collective action under the FLSA. Section 216(b) of the FLSA allows employees to represent similarly situated employees in an action against their employer for failure to pay wages owed. 29 U.S.C. § 216(b). But unlike class actions brought under Federal Rule of Procedure 23, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party ...." *See id.*; *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (the FLSA requires that employees receive "accurate and timely notice concerning the pendency of the collective ac-

tion, so that they can make informed decisions about whether to participate.").

■■■■■■ Neither the FLSA, nor the Ninth Circuit, has defined the term "similarly situated" for purposes of certifying a collective action. *Brewer v. Gen. Nutrition Corp.*, No. 11–cv–03587 YGR, 2013 WL 100195, at *2 (N.D.Cal. Jan. 7, 2013). Certification of a collective action under the FLSA typically proceeds in two-stages. *See id.*; *Harris v. Vector Mktg. Corp.*, 716 F.Supp.2d 835, 837 (N.D.Cal.2010). At the initial "notice stage," the Court determines whether the plaintiffs are "similarly situated," deciding whether a collective action should be certified for the purpose of sending notice of the action to potential class members. *Brewer*, 2013 WL 100195, at *2. At this initial stage, plaintiffs can satisfy their burden to show that they are "similarly situated" by making substantial allegations, supported by declarations or discovery, that "the putative class members were together the victims of a single decision, policy, or plan." *Id.*, at *3 (quoting *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102 (10th Cir.2001)). This determination is made based on a fairly lenient standard, and typically results in a conditional certification. *Brewer*, 2013 WL 100195, at *3. "The requisite showing of similarity of claims under the FLSA is considerably less stringent than the requisite showing under Rule 23 of the Federal Rules of Civil Procedure. All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA." *Hill v. RL Carriers, Inc.*, 690 F.Supp.2d 1001, 1009 (N.D.Cal.2010) (quoting *Wertheim v. Arizona*, No. 92–cv–453, 1993 WL 603552, at *1 (D.Ariz. Sept. 30, 1993)); *see also Harris v. Vector Mktg.*

*Corp.,* 753 F.Supp.2d 996, 1003 (N.D.Cal. 2010).

The second determination is made at the conclusion of discovery, usually upon a motion for decertification by the defendant, when courts apply a stricter standard for similarly situated employees and review several factors, including whether individual plaintiffs' claims involve disparate factual or employment settings; the various defenses available to the defendant which appear to be individual to each plaintiff; as well as fairness and procedural considerations. *Brewer,* 2013 WL 100195, at *3.

■ Here, the Court finds that plaintiffs have satisfied the lenient standard for conditional certification. The First Amended Complaint alleges that plaintiffs Thio and Liem and the collective action members were employed as Sushi Team Leaders by Genji, and that they were not paid their overtime and minimum wages for all hours worked in violation of the FLSA. Dkt. No. 5–1 ¶ 67. The complaint further alleges that, as Sushi Team Leaders, Thio and Liem were not paid overtime wages regardless of the number of hours they worked Dkt. No. 5–1 ¶¶ 8, 12. Plaintiffs Thio and Liem provided sworn declarations in support of the allegations in the complaint. Dkt. Nos. 41–5, 41–6. Plaintiffs' counsel also submitted a declaration stating that, for the overwhelming majority of the class period, Genji did not pay any of its California Sushi Team Leaders for all hours worked in violation of California overtime laws, or its non-California Sushi Team Leaders for overtime hours worked in excess of forty per week. Dkt. No. 38 ¶ 21. Plaintiffs have thus sufficiently demonstrated that the potential collective action members were subject to the same policy or practice that resulted in Genji's failure to pay wages as required under the FLSA. Conditional certification of this collective action is therefore warranted.

## C. Class Notice

The notice to be delivered to class members includes the information required by Rule 23 of the Federal Rules of Civil Procedure. Specifically, the proposed class notice describes the nature of the action, the definition of the class and subclasses, and the class-wide claims. The proposed notice further explains that class members may appear through an attorney and that the Court will exclude those members requesting exclusion. The notice also specifies the time requirements and manner of requesting exclusion, as well as the binding effect of a class-wide judgment. *See* Fed. R. Civ. P. 23(c)(2)(B) (stating that "[t]he notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)").

In addition, the notice explains that class members may object, indicates the time and place of the final approval hearing, provides information regarding the attorneys' fees and incentive awards to be requested by class counsel, and states that additional information regarding the settlement is available through the claims administrator or class counsel, whose contact information is provided in the notice. The notice also explains that the settlement fund will be allocated among several subclasses, and that will contain additional

information, including the as well as all relevant pleadings in this lawsuit.

The Court approves the proposed notice to the class members. Dkt. No. 41–1.

## IV. CONCLUSION

The Court grants preliminary approval of the settlement, conditionally certifies the class and collective action for settlement purposes, and approves the proposed form of notice. The Court also approves the proposed class counsel, class representatives, and claims administrator. Plaintiffs' motion(s) for final approval, for incentive awards, and for class counsel fees and costs must be filed no later than the date on which the claims administrator mails the notice, claim form, and exclusion form to the class members.

The Court will hold a final approval hearing on December 3, 2014, at 1:00 p.m. in Courtroom A, 15th Floor, U.S. District Court, 450 Golden Gate Avenue, San Francisco, California.

IT IS SO ORDERED.